In the Matter of the ESTATE OF
Ronald D. PALAMARA,
Deceased.

Roger S. Palamara, Personal
Representative.

Karen L. PALAMARA, Appellant,
(Plaintiff below),

v.

Roger S. PALAMARA, Appellee
(Defendant below).

No. 30A01–8612–CV–317.

Court of Appeals of Indiana,
First District.

Oct. 6, 1987.

Rehearing Denied Nov. 6, 1987.

Thomas A. Withrow, B. Keith Shake, Henderson, Daily, Withrow & DeVoe, Indianapolis, Ronald R. Pritzke, Pritzke & Davis, Greenfield, for appellant.

Alan H. Lobley, Jerome M. Strauss, Ice Miller Donadio & Ryan, Indianapolis, James L. Brand, Free Brand Tosick & Allen, Greenfield, for appellee.

ROBERTSON, Judge.

This is an appeal from a judgment in favor of the estate of Ron Palamara in an action brought by Ron's second wife, Karen, for rescission of an antenuptial agreement and imposition of a constructive trust. Restated, the issues presented by Karen for review are:

(1) Whether the trial court's determination that Karen was estopped from challenging the validity of the agreement is contrary to law;

(2) Whether the trial court's determination that Karen had demonstrated no basis for setting aside the agreement is contrary to law;

(3) Whether the trial court erred in admitting Ron's federal estate tax return;

(4) Whether the trial court committed reversible error by excluding certain testimony proffered by Karen; and,

(5) Whether the trial court improperly granted the personal representative's motion for change of venue.

Having carefully considered these issues, we find no basis for overturning the judgment of the trial court. Accordingly, we affirm.

The facts most favorable to the trial court's judgment are as follows. Ron, who was chief executive officer of Anacomp, Inc. met and became close friends with Karen between 1974 and 1978, while Karen was employed by Anacomp. They began dating in January of 1978 when Karen was residing in Nevada. Thereafter, Karen returned to Indiana and Anacomp, working for a time as the secretary for the senior vice-president of data services, in a department which provided services primarily to banks and credit unions. Eventually, Karen reported directly to the chief financial officer of the corporation. She enrolled at Indiana University-Purdue University at Indianapolis where she studied accounting.

In 1982, Ron discovered he had cancer and began receiving treatments. Karen spent evenings at Ron's home during his recuperation and prior to his first surgery. Subsequently, in October of 1984, Ron went into the hospital for a second surgery, believing that the cancer had gone into remission. Karen and Ron discovered at that time that he had in fact not been cured and had only ninety days to live.

During Ron's hospitalization, Karen and Ron decided to marry. Ron expressed to Karen his desire to leave his estate to his family and would agree to marry only if she would sign an antenuptial agreement. Ron had an agreement prepared during November, 1984. Karen learned in mid-November that she would receive from Ron an income of approximately $1,000 per month for the remainder of her life. Ron instructed his staff to bring the prepared agreement to his home after he was discharged from the hospital. He remained hospitalized until late November, 1984. Ron's personal secretary delivered the agreement to Ron's home where Karen was living on December 3, 1984.

Karen read over the agreement on the evening of December 6, 1984. On December 7, 1984 she met with Ron's attorney and personal secretary for about an hour to go over the document and Ron's assets, before she and Ron executed the agreement and were married. Ron's financial matters were presented to Karen by way of an "asset summary," a financial sheet prepared by Ron's secretary which Ron had devised to keep himself apprised on a monthly basis of his assets and liabilities. Ron's secretary spent approximately fifteen minutes with Karen reviewing the document line by line and explaining entries on the sheet.

Ron's attorney spent the remaining forty-five minutes reviewing the agreement with Karen. He explained to Karen her rights without an agreement as a surviving second spouse upon Ron's death. Karen indicated that she and Ron had agreed that Karen's daughter, Kelly, was to receive the income provided Karen by the agreement should Karen die before Kelly reached the age of 25. Additionally, Karen indicated that Ron had agreed to provide for Kelly's education, independently of Karen's income. The agreement was amended to provide that Kelly would receive Karen's income as Karen requested but no changes were made in the agreement to incorporate a provision for Kelly's education. Ron's attorney advised Karen to have her attorney look over the agreement before she signed it, at this meeting and subsequently, before Karen executed the document. Karen declined to have an attorney review the document on her behalf. Approximately a week after the wedding, Ron and Karen met with Ron's attorneys and personal representative for estate planning purposes. Ron arranged at that time for a fund to finance his obligation contained in the antenuptial agreement. Ron lived for about six weeks after the wedding.

By issues one and two, Karen challenges the trial court's evaluation of the evidence. Karen challenges the trial court's factual conclusion that she knowingly affirmed the agreement by accepting its benefits in issue one. Karen attacks, in issue two, the trial court's ultimate factual conclusion that she understood the nature of the agreement she was executing and that under the circumstances, the agreement was fair and resulted in full disclosure. She maintains that (1) Ron's failure to disclose to her fully the nature and extent of her statutory rights as *his* surviving, second spouse prevented her from giving an effective waiver of her statutory rights; (2) the circumstances surrounding the execution of the agreement, including Ron's failure to provide her with a practical opportunity to review the document with independent

legal counsel, kept her from freely waiving her statutory rights; and (3) the circumstances indicate that Karen was constructively defrauded, rendering the agreement unconscionable.

■ In a civil case such as this, the burden of proof rests with the plaintiff to establish the elements comprising his claim by a preponderance of the evidence. *Andis v. Newlin* (1982), Ind., 442 N.E.2d 1106, 1108. In a trial to the court, the judge hearing the case is the sole judge of the weight of the evidence and the credibility of witnesses. Due deference to the fact-finding function of the trier of fact requires that a judgment against the party bearing the burden of proof be affirmed on appeal unless it can be said that the evidence is without conflict and leads unerringly to a result not reached. *Id.* When we review a case in which the trial court has rendered findings of fact and conclusions of law, we will not set aside that court's judgment unless it is clearly erroneous. Ind. Rules of Procedure, Trial Rule 52; *In Re the Wardship of B.C.* (1982), Ind., 441 N.E.2d 208, 211.

### I.

Karen contends that she should not be estopped from challenging the validity of the antenuptial agreement because she retained funds deposited in her personal checking account by Ron's trustee. She takes issue with the trial court's conclusion that "by accepting the payments from the trust in the months of February through June of 1986 and using the money so received [she] knowingly accepted the terms of the prenuptial agreement." Karen maintains she retained the funds under color of court authority; that the funds emanated from a trust, independent of benefits resulting from the agreement; that her rescission of the agreement by tender of the funds was timely made; and, that she was entitled to the funds whether or not she succeeds in this action.[1]

---

1. We surmise that this is a policy argument against the application of the doctrine of estoppel in this case. However, since we must speculate about her argument, we will not deal with this contention further. *See* Ind.Rules of Procedure, Appellate Rule 8.3(A)(7).

Again, our function on appeal is limited to ascertaining whether there is probative evidence to support the findings and judgment. Where, as here, special findings have been properly requested, the parties are entitled to have the court state the ultimate facts so that a court of review may properly consider the basis for the judgment. *Stanzione v. Pascevich* (1982), Ind.App., 431 N.E.2d 847, 849. This does not mean that a reversal is merited whenever a technical deficiency may appear. *Id., Dean v. Dean* (1982), Ind.App., 439 N.E.2d 1378, 1382. Ind.Rules of Procedure, Trial Rule 52 permits a judgment based on special findings to be set aside only when clearly erroneous. *Id.* We will construe the findings together liberally in favor of the judgment. *Id, Stanzione, supra.*

Our review of the record discloses discrepancies between the evidence in the record and the months and dates contained in the trial court's factual findings # 6 and # 7, but these deviations from the record are minor. We find evidence indicating that Karen tendered $11,000 from February, 1985, when the trust began crediting her account, through February, 1986. The trust continued to credit Karen's account in 1986 but no tenders were made by Karen until immediately before trial. The case was tried in July, 1986. Karen admitted that she used the money deposited in her account during the months when no tenders were made to pay expenses and to make payments on her condominium. The record indicates that Karen did not petition the Hamilton Superior Court for release of the funds until April 25, 1986; by that time she had the use of the March, 1986 deposit, interest free, for two months and the August, 1985 deposit for eight months. The order releasing the funds was entered April 29, 1986 and vacated May 7, 1986. Karen tendered an additional $5,000 on July 14, 1986; presumably, she never tendered the payment received in August, 1985.

Thus, the evidence supports the trial court's factual findings that Karen used the money for her personal expenses and deprived the trust of the income the payments would have produced had they been retained under court supervision in an interest bearing account. The evidence recited *precludes* the conclusion that Karen retained the funds under color of court authority; she began retaining the funds before she obtained court approval and continued to use the funds after it became apparent that the court would not sanction the release of the funds without a hearing on the matter some two months later.

Similarly, Karen's contention that she was entitled to retain the payments because they were not a benefit of the agreement is simply not supported by the evidence of record. Both the agreement and the trust are linked by language which on the face of the documents contradicts this assertion.[2] Furthermore, the record indicates that Karen was present at a meeting approximately a week after the wedding when the matter of funding Ron's promise to pay $1,000 per month was discussed and it was determined that a marital trust would be created.

Karen's assertion that her tender before trial was timely is premised upon *Crane Co. v. Newman* (1941), 111 Ind.App. 273, 37

2. The trust provided in part:

During the lifetime of the Settler's (sic) wife, the Trustee shall pay the greater of One Thousand Dollars ($1,000) per month or all the net trust income per month to the Settler's wife. *Such monthly payments shall be in full and complete discharge of the Settler's obligations to his wife under their Agreement dated December 7, 1984.* (Emphasis added.)

The Antenuptial Agreement, executed and dated December 7, 1984 contains the following provision:

If Ron shall die leaving Karen as his surviving spouse, Ron agrees and promises to provide for the payment of the sum of One Thousand Dollars ($1,000) per month after his death to Karen for her lifetime.... Karen agrees that the decision regarding the method of discharging Ron's obligation under this Agreement to provide for the payment after his death of One Thousand Dollars ($1,000) per month to Karen for her lifetime ... shall be solely Ron's to be exercised pursuant to his direction to his personal representative under his last will and testament or the trustee under a trust created by him, *whichever such instrument may provide for the discharge of his obligation under this Agreement to Karen....*

N.E.2d 732, *trans. denied.* In that decision, the appellate court reiterated that a contract induced by fraud may be avoided if the party wishing to be restored to rights possessed before the contract promptly disaffirms the contract. The issue before the court was whether a rescission and tender of money received in a personal injury settlement had been timely made 90 days after the filing of the complaint. The court determined that the rescission of a voidable contract and tender of benefits received from the contract is timely made when made within a reasonable time after the matter has been pleaded.

■■■ In our view, *Crane Co. v. Newman, id.* is not as helpful to Karen as she portrays it to be since in the present factual situation, the question is not whether Karen's tender of the payments was timely, but whether she restored the benefits received. In this state, a party may not accept benefits under a transaction or instrument and at the same time repudiate its obligations. *Raymundo v. Hammond Civic Association* (1983), Ind., 449 N.E.2d 276, 283. A party to an agreement is confined to the position which he first adopts unless he annuls that election by restoring the benefits received. *Hight v. Carr* (1916), 185 Ind. 39, 112 N.E. 881. *See also Keys v. Wright* (1901), 156 Ind. 521, 60 N.E. 309. Karen requested that the court return the parties to the status quo. A return to the status quo requires that she return all benefits received from the contract including any money paid under the contract, plus interest. *Grissom v. Moran* (1973), 154 Ind.App. 419, 435, 436, 292 N.E. 2d 627, *trans. denied.*

■■ The evidence establishes that Karen enjoyed the benefit of the contract while repudiating its obligations. Karen began receiving payments from the trust in February 1985. She enjoyed the use of these payments until July, 1985 when she filed her complaint and with full knowledge of both the circumstances and the legal conse-quences, began tendering the payments. The evidence establishes that thereafter, in August, 1985, and subsequently in March through July, 1986, Karen used the monthly deposit as an interest free loan which she attempted to repay before trial. Karen never did restore in full the benefit she received. Having failed to unequivocally demonstrate that she elected to seek rescission, Karen is deemed to have adopted the contract. The trial court's conclusion that Karen knowingly accepted the terms of the agreement is therefore not contrary to law.

## II.

Karen also takes issue with the trial court's alternative basis for denying relief: that Karen had demonstrated no basis for setting aside the agreement. Karen's position seems to be that I.C. 29–1–3–6 [3] placed upon Ron an affirmative duty to fully disclose to her, prior to her execution of the agreement, the nature, extent and *fair market value* of all his possessions as well as the duty to explain to her the legal consequences of her action. She insists that her waiver would be effective only if the evidence showed she fully understood the "true value" of her statutory share.

■■ Ignoring for the moment Karen's failure to acknowledge the binding nature of the trial court's conclusion that there was full disclosure, we reiterate that with respect to antenuptial agreements, there is no absolute and mandatory duty imposed upon spouses contemplating marriage to fully disclose the *value* of all possessions. *See Estate of Stack v. Venzke* (1985), Ind.App., 485 N.E.2d 907, 910, *trans. denied.* This court rejected the argument that the failure to completely disclose the value of one's property, standing alone, constituted a sufficient basis for holding an antenuptial agreement invalid in *Johnston v. Johnston* (1962), 134 Ind.App. 351, 184 N.E.2d 651, 654, *trans. denied.* In Indiana, our courts have uniformly up-

---

**3.** I.C. 29–1–3–6 provides that "the right of election of a surviving spouse ... may be waived before ... marriage by a written contract ... after full disclosure of the nature and extent of such right, ..." This section has not been amended since it was added to the code by Acts 1953, ch. 112, § 306. *See* Ind.Code Ann. § 6–306 (Burns 1953).

held antenuptial contracts where fairly entered into, even though the effect be to leave the surviving spouse little. Agreements entered into in contemplation of marriage are distinguishable from postnuptial agreements in that the marriage itself forms the consideration for the agreement, a consideration which is valued and respected by the law. *See Mallow v. Eastes* (1913), 179 Ind. 267, 275, 100 N.E. 836, 839; *In re the Marriage of Boren* (1985), Ind., 475 N.E.2d 690, 693. Antenuptial agreements are favored because they promote domestic happiness; they cannot equitably be rescinded in cases such as this because the agreement has been partially executed by one party to the marriage. *Mallow, supra.* Accordingly, antenuptial agreements entered freely, without fraud, duress or misrepresentation and which are not unconscionable under the circumstances are valid and binding. *Boren, supra.*

▮▮▮▮ Additionally, we would point out that a mistake as to the law, of itself, is also not a sufficient ground upon which to set aside an antenuptial agreement. *Lamb v. Lamb* (1891), 130 Ind. 273, 275, 30 N.E. 36. Ordinarily, the presumption would be that each of the parties was aware of the provisions made by law and that they contracted with full knowledge of such legal provisions, *Kennedy v. Kennedy* (1898), 150 Ind. 636, 645, 50 N.E. 756, but if one of the parties knowingly or fraudulently misrepresents the law or the facts, and thereby gains an unfair advantage over the victim of the misrepresentation, the contract may be set aside. *Johnston,* 184 N.E.2d at 653.

▮▮▮ Thus, the law requires that the trial court consider whether the parties entered into the agreement fairly, without fraud or misrepresentation. In the present case, the trial court determined that Karen had demonstrated no basis for setting aside the agreement, concluding as a matter of ultimate fact that Karen understood the nature of the agreement, that it was fair and resulted from full disclosure. The evidence amply supports these conclusions. We find no evidence supporting the contrary conclusion, necessarily urged by Karen, that Ron intentionally concealed assets or made untruthful representations about his net worth. More importantly, we find no evidence from which it could be inferred that Karen was actually misled as to the extent of her statutory share.

Ron's estate was presented to Karen in the same format as Ron's assets and liabilities had been presented to Ron on a monthly basis, by way of an "asset summary" which listed some assets at cost. Karen argues that the distinction between cost and fair market value is significant in this case because of the size of Ron's estate. She contends that the valuation of Ron's assets at cost in the asset summary was misleading because it caused Ron's true net worth to be underestimated.

Had Karen been given only the paper summary of Ron's assets and liabilities, there might be some merit in her contention that the listing of some assets at cost misled her. However, Ron's personal secretary testified that she instructed Karen that Ron's preference was to have some assets reported to him at cost, and that she explained to Karen line by line, just as she did for the trial court, what each entry represented. Moreover, the actual summary given Karen was fairly self-explanatory; the asset summary showed an approximate value in addition to cost for several of the disputed entries. Other assets could only be shown at fair market value. Finally, we would note that the estate directly controverted Karen's assertion that the summary underestimated Ron's true net worth with testimony from Ron's corporate trustee who opined that when reconciled with the estate tax return, the asset summary actually *overstated* Ron's net worth by $650,-000.

It is not disputed that the asset summary was incomplete, omitting certain assets such as Ron's income, automobiles, household furnishings, art collection, life insurance policies and stock options.[4] However,

4. Ron did not have his income reported to him on the asset summary so Karen was not briefed

on his annual income as president of Anacomp Corp. The record indicates however that as a

the evidence establishes that Karen either knew of and was familiar with the property omitted or had been informed in some manner of the extent of Ron's interest.

Ron's attorney testified at trial that, while he could not remember exactly what he said, he did advise Karen of her right as a second childless spouse to take against the will. He testified that he rehearsed the advisement with another attorney before giving the advisement to Karen. The notes made by Ron's secretary of the December 7th meeting indicate that Karen was advised that she was entitled to one-third of Ron's estate "automatically."

In sum, while Karen would have us believe that she did not understand the nature and extent of Ron's property, we believe the strong inference from Karen's educational background and employment history is that she was capable of and did understand the distinction between cost and fair market value, and did understand the nature of the agreement she was executing. Based upon the evidence before it, the trial court could easily have concluded that Ron's assets were disclosed to Karen in good faith, without intentional misrepresentation, and that Karen understood the extent of her statutory share. We will not substitute Karen's evaluation of the evidence for that of the trial court.

■ We also find little merit in Karen's assertion that the evidence leads to the conclusion that the circumstances of the execution prevented her from freely entering into the agreement. This is simply not a case where the husband springs the agreement on the wife at the last minute and gives the wife an ultimatum. Karen knew from the start of her engagement that there would be an antenuptial agreement. She knew what the terms of the agreement would be early on and had time to reflect upon them. There is evidence in

the record that Karen knew a draft of the agreement was available in November had she wished to read it. The agreement was brought to Ron's home where Karen was staying three full days before its execution. Karen was also advised, at least twice on her wedding day, that she should consult an attorney; she chose not to act on that advice. The record establishes that Karen had ample opportunity to consult with an attorney and have one review the language of the document, had she made her wishes known. There is thus little basis in the record for concluding that Karen's volition had been overcome by the coercive nature of the circumstances.

■ Karen's final contention with respect to the fairness of the agreement is that Ron constructively defrauded her by exercising undue influence over her. Karen's argument appears to be both that the relationship between individuals contemplating marriage gives rise to a presumption of undue influence which the estate must rebut and that Ron dominated her, thereby taking an "unconscionable advantage" over her. Again, this argument is little more that a repetition of an argument rejected by this court in *Johnston, supra.* The existence of the confidential relationship between husband and wife creates a presumption of undue influence *only when* accompanied by facts and circumstances which suggest that one party occupies a dominant position and has obtained a substantial advantage over the other, vitiating free will. 184 N.E.2d at 654. We find no evidence in the record which would reasonably lead one to the conclusion that Ron had obtained a dominancy over Karen such that she was incapable of exercising independent judgment. Indeed, the record indicates to the contrary that Karen was more than capable of protecting her own interests: Karen made certain before she signed the agreement that it provided her

stockholder, Karen was provided this information by way of the corporation's annual report. Karen admitted that she perused the company's reports to shareholders because of her interest in Ron. The record also discloses that the annual statements report the extent of Ron's holdings in stock options, though the evidence establishes that the options had no value at the time

Karen signed the agreement. Finally, as the estate points out, Ron had no duty to disclose the existence of life insurance to Karen since any proceeds from the policies would pass outside of his estate. *See e.g. Leazenby v. Clinton County Bank & Trust Co.,* (1976), 171 Ind.App. 243, 355 N.E.2d 861, 863 and *Wilkins v. Young* (1895), 144 Ind. 1, 8, 41 N.E. 590.

daughter with the promised income should Karen die before the daughter reached the age of twenty-five.

### III.

Karen contends the trial court improperly admitted Ron's federal estate tax return into evidence. She claims in her brief that the return contains and has attached to it the statements of others concerning the value of assets which constitute hearsay and render the return inadmissible. Karen argues that the trial court improperly utilized the return in making the factual finding that the asset summary fairly advised Karen of Ron's net worth.

Karen objected at trial to the offer of the estate tax return in the following manner:

BY THE COURT: Any objections?

BY MR. WITHROW: It depends if exhibit A, is that the Estate tax return?, is being offered your Honor to show only the numbers computed by Mr. Roger Palamara or his agent for purposes of the Estate tax return and it's (sic) filing we don't have a problem with that, if however the document is being offered *to prove the truth of the hear say (sic) documents attached without identification by an appropriate witness* then we have a number of objections *to the the supporting documents,* so if again if the documents being offered solely to show the Estate tax returns (sic) and the numbers computed by the witness we don't have any objection.

BY MR. LOBLEY: We are offering it to show what the Estate reported as values of the property for the estate tax return.

BY MR. WITHROW: But not necessarily the market value, the fair market value of those assets, but only what the Estate reported.

BY MR. LOBLEY: What the Estate reported as the fair market value.

BY THE COURT: Nevertheless if there is an objection it's overruled A admitted.

Record at 485–87. (Emphasis supplied.)

 Karen unequivocally stated at trial that her objection was to the lack of foundation for the supporting documents, not to the return itself or the numbers computed by the witness. Karen did not direct the court's attention to the possibility that the witness, in computing the numbers assigned to assets, may have relied upon information which was not within his personal knowledge. An objection to evidence must be full and comprehensive in pointing out the particular reason for the objection. *Lakes v. Moore* (1965), 137 Ind. App. 681, 206 N.E.2d 152, 153, *trans. denied.* The rule is fundamental that this court will not reverse a ruling of the trial court unless the specific objection relied upon was presented to that court for consideration. *Widmer v. Sweeney et al.* (1955), 234 Ind. 263, 267–268, 124 N.E.2d 385; *Bryant v. State ex rel. Van Natta* (1980), Ind.App., 405 N.E.2d 583, 584. Furthermore, a valid basis for the objection differing from the one cited at trial may not be urged upon appeal. *State v. Maplewood Heights Corp.* (1973), 261 Ind. 305, 302 N.E.2d 782, 785. The argument portion of the brief must approach the objection on the same ground as that made at the time of trial. *Lakes v. Moore, supra.* Karen did not raise her claim that the return itself may have contained hearsay evidence. Consequently, she preserved error only with respect to the admission of the attachments. *See, Duke's GMC, Inc. v. Erskine* (1983), Ind.App., 447 N.E.2d 1118, 1120.

The second contention raised by Karen in her brief, that the admission of the return was error because the return contained hearsay declarations of the value of assets "as of the date of death and not the fair market value as of the time the Asset Summary was provided to Widow," is also waived for the same reason.

 Thus, the only question properly before this court is whether the trial court committed reversible error by failing to separate the return (form 706) from its attachments. Any error in the admission of evidence is harmless if the same or similar evidence is submitted without objec-

tion. *Duke's GMC, Inc., supra.* at 1121. Hence, no harm came to Karen as a result of the admission of the Family Trust Agreement or the appraisals of Ron's automobiles, coins or South Street property since Karen also introduced the same evidence. Assuming there is inadmissible evidence in the remaining attachments, which include copies of Ron's will, death certificate, QTIP election, estate tax check to the Internal Revenue Service, and the appraisals of Ron's home, household furnishings, jewelry and art collection,[5] the burden is on Karen to affirmatively show that any error in the admission of these remaining attachments was prejudicial to her substantial rights. *Hebel v. Conrail, Inc.,* (1985), Ind., 475 N.E.2d 652, 659, 660. Karen has made no such showing.

### IV.

Karen contends that the testimony which she proposed to give on her own behalf concerning Ron's promises to provide her with financial security for the rest of her life was improperly excluded by the trial court under the dead man's statute, I.C. 34–1–14–6. She insists that at the time she made her offer to prove, Ron's personal representative had already waived any objection to her competency by his cross-examination of her. Karen cites as authority *Young v. Montgomery* (1903), 161 Ind. 68, 67 N.E. 684 and *Timmons v. Gochenour* (1917), 69 Ind.App. 295, 117 N.E. 279, *trans. denied.*

■ In *Young v. Montgomery, supra,* the supreme court explained that the policy of the law in precluding an adverse party from testifying when a judgment is sought against an estate is to prevent the living from taking an unfair advantage of the estate of the dead. The law recognizes however that it may sometimes be to the advantage of the estate to permit an adverse party or incompetent witness to testify. To this end, the personal representatives of the deceased may exercise discretion in making an incompetent witness competent. However, by making an incompetent witness a witness for the estate, the personal representative accredits such witness with competency and renders him entirely competent in the cause, to be used by any party to the suit. *Young, id.* at 73–74, 67 N.E. 684.

■ A personal representative may make a witness competent by calling the witness on the estate's behalf, *see Peoples Trust Co. v. Hinton* (1931), 95 Ind.App. 472, 177 N.E. 353; by failing to object when the adverse party calls himself to testify on his own behalf, *see Dime Savings & Trust Co., Adm'r. v. Jones* (1926), 84 Ind.App. 508, 151 N.E. 701; or by questioning beyond the scope of direct examination, *see Timmons v. Gochenour, supra,* 69 Ind.App. at 300, 117 N.E. 279. Furthermore, while it is clear in Indiana that the mere taking of a discovery deposition does not waive the privileges of the dead man's statute, *Plummer v. Ulsh* (1967), 248 Ind. 462, 229 N.E.2d 799, the offering by the personal representative of an incompetent witness's testimony obtained by deposition might well amount to such a waiver. *See, Plummer, id.,* 229 N.E.2d at 801 and *Craig v. Norwood* (1916), 61 Ind.App. 104, 108 N.E. 395, *trans. denied* (testimony given at former trial of same cause of action waiver of witness's competency in subsequent case).

■ In the present case, the estate's cross-examination of Karen went beyond the scope of direct examination into three areas: the location of Karen's condominium, its value and monthly cost; Karen's knowledge that there would be no wedding if she rejected the agreement; and, amounts transferred into Karen's personal account by American Fletcher National Bank to pay off outstanding debts. The personal representative also selectively

---

5. Karen claims that she was prejudiced by the erroneous admission of the return because the trial court used the return as a basis for comparison with the Asset Summary. As Karen has pointed out, the household furnishings, art collection and Ron's jewelry were not included in the Asset Summary. If Karen stands by her primary argument that these omissions constituted evidence of fraudulent nondisclosure, she could not have been harmed by the admission of these documents.

read into evidence portions of Karen's deposition, and requested that the court publish the deposition. Based upon the authorities cited above, we conclude that the estate abandoned its objection to Karen's competency as a witness, waiving the question and rendering her a competent witness on her own behalf on any matter.

■ Nonetheless, we believe the trial court's error in circumscribing Karen's redirect testimony was harmless. Karen made one offer to prove. The record indicates that Karen was asked whether she had a conversation with Ron concerning her future financial security and what the content of that conversation was. According to the offer to prove, Karen would have answered "that Ron told her not to worry about her future that she would be provided with financial security for the rest and duration of her life." (R. 861).

Karen characterizes this proposed testimony as indicating a promise to provide her additional financial security and income beyond that provided by the antenuptial agreement. Contrary to Karen's view of her proposed testimony, the evidence proffered shows only that Ron intended to provide for her in an amount which he believed would provide her with financial security. The evidence already before the court established that Ron had provided Karen by trust with a minimum monthly income for life of $1,000, that the trust corpus could be invaded by the trustee to adequately provide for her support and well-being if necessary, that Karen had received $30,000 from one of Ron's life insurance policies, and that payments had been made by both Ron and his estate toward her outstanding debts. In light of the ambiguous and cumulative nature of the excluded evidence, and the fact that the trial was by the court without a jury, the impact of the trial court's evidentiary error was minimal. *See In re Marriage of Lopp* (1978), 268 Ind. 690, 378 N.E.2d 414, 424, *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1023, 59 L.Ed.2d 76 (1979); *Terre Haute First National Bank v. Stewart* (1983), Ind.App., 455 N.E.2d 362, 365, *trans. denied*. We cannot conclude the error affected Karen's substan-

tial rights. *See Hebel, supra*. Accordingly, we find no reversible error.

## V.

■ Finally, Karen contends that the trial court erred in granting the personal representative's untimely motion for change of venue. She maintains that her complaint for rescission and constructive trust was placed on the trial court's issue docket, as a probate proceeding, either on July 2, 1985, the day it was filed, or on July 8, 1985, the day the claim form was filed. Therefore, the personal representative's motion which was filed on August 27, 1985, was not filed within thirty days as provided by Ind.Rules of Procedure, Trial Rule 76(4).

T.R. 76 provides:

(2) In any action except criminal no change of judge or change of venue from the county shall be granted except within the time herein provided. Any such application for a change of judge or change of venue shall be filed not later than ten (10) days after the issues are first closed on the merits.

\* \* \* \* \* \*

(4) Provided further, in those cases of claims in probate ..., the parties thereto shall have thirty (30) days from the date the same is placed and entered on the issue and trial docket of the court.

The crux of Karen's argument is that her action for rescission and constructive trust amounts to a claim in probate against the estate, bringing the action within the purview of T.R. 76(4). Assuming without deciding that Karen has correctly characterized the action as a claim in probate rather than an action in equity to set aside a contract for fraud, T.R. 76(4) provides that the parties "shall have thirty days from the date the [claim] is placed and entered *on the issue and trial docket of the court.*" I.C. 29–1–14–10 contemplates the transfer of a claim from the "claim and allowance docket" to the "issue docket" when a claim has been disallowed by the personal representative or when the personal representative fails to allow or disallow a claim within five months and fifteen days after the first published notice to creditors. The purpose

of this procedure is to afford the personal representative an opportunity to investigate the merits of the claim and if he or she determines it to be a just claim, to pay it without delay and avoid the expense of litigation. *Baker v. Happ* (1944), 114 Ind. App. 591, 54 N.E.2d 123, 126. Thus, according to I.C. 29–1–14–10, a claim is at issue, not when the claim is filed, but when the personal representative takes or fails to take action, causing it to be at issue.

In the present case, there is no showing that the personal representative either entered a notation to disallow Karen's claim in the margin of the claim and allowance docket, or failed to take action within the period prescribed by I.C. 29–1–14–10. Hence, to the extent that Karen is correct as to the applicability of T.R. 76(4), she has failed to show that the motion for change of venue was untimely as provided by the rule. Consequently, the trial court did not err in granting the personal representative's motion for change of venue.

Judgment affirmed.

NEAL and HOFFMAN, JJ., concur.