Charles R. RIDER, Appellant
(Petitioner Below),

v.

Leslie Anne RIDER, Appellee
(Respondent Below).

No. 48S02–9510–CV–01137.

Supreme Court of Indiana.

July 26, 1996.

Rehearing Denied Dec. 16, 1996.

Joan Bashaw Gregg, Gregg & Bybee, Anderson, for Appellant.

David W. Stone IV, Stone Law Office & Legal Research, Anderson, for Appellee.

ON PETITION TO TRANSFER

SELBY, Justice.

Charles Rider petitioned for dissolution of his marriage and sought to enforce an antenuptial agreement that he and his wife had executed just prior to marriage. The trial

court enforced part, but not all, of the antenuptial agreement, and the Court of Appeals affirmed. We granted transfer, and we now hold that the trial court erred by not enforcing this agreement in its entirety.

### FACTS

On February 8, 1988, Leslie Ann Sears and Charles Russell Rider entered into an antenuptial agreement. The agreement provided that "by virtue of the said marriage, neither one shall have or acquire any right, title, or claim in and to the real and personal estate of the other," and that "each party, in the case of a separation of the parties hereto, shall have no right as against the other by way of claims for support, alimony, attorney fees, legal and court costs, or division of property." The couple married on February 14, 1988. They lived in the house owned by Leslie, along with Leslie's teenage daughter from a prior marriage. They separated on August 13, 1992, and Charles sued for divorce on October 27, 1992.

Prior to marriage, Leslie worked as an auditor and Charles was employed by Delco Remy. Leslie owned her home, and each owned a car, but neither had any other property of significance. During their four-and-one-half year marriage, Leslie's health deteriorated, and she was diagnosed with inflammatory neuropathy. Her condition is incurable and causes considerable pain. As a result, Leslie quit her job and is now unable to work. Leslie sought social security disability benefits, but her claims have been denied. Also during the marriage Charles elected early retirement, and he now receives a modest pension.

### PROCEDURAL HISTORY

During divorce proceedings, Leslie asked the trial court to enforce the antenuptial agreement with respect to property, but because of her condition and her inability to support herself, she asked the court to find the agreement to be invalid with respect to maintenance. The trial court agreed, finding that the

Antenupitual [sic] agreement entered into by the parties should be enforced as it relates to property. Each party shall be awarded the property that they brought into the marriage.... Regarding maintenance, the Court finds that the Antenupitual [sic] agreement is not binding. The Court finds the respondent to be physically incapacitated to the extent that the ability of the respondent to support herself is materially affected and the Court finds that maintenance is necessary during her period of incapacities, subject to further order of the Court.

Accordingly, the court ordered Charles to pay Leslie $225 per month.[1]

Charles requested specific findings pursuant to IND.TRIAL RULE 52(A), and the trial court provided additional findings, including:

7. The Respondent's earning ability is extremely low due to this disease and her inability to work.

8. The Respondent owns a home worth approximately somewhere between $60,000 and $70,000.

9. The Respondent has further assets available in a savings account of approximately $5,500.

10. The Respondent has further personal property worth an unspecified amount.

11. The Respondent is not capable of supporting herself by income earning and further, she does not possess assets sufficient to provide her with adequate support.

12. The antenuptial agreement in this cause should not be enforced because to do so would leave Mrs. Rider unable to provide for her reasonable needs.

■ Charles appealed from the trial court's award of maintenance, raising the issues of whether the trial court's decision amounted to an unconstitutional impairment of contract and whether the trial court erred by refusing to enforce the no-maintenance

---

1. We note that the issues of provisional maintenance and attorney's fees have not been properly preserved and are not before us.

provision of the antenuptial agreement. In *Rider v. Rider,* 648 N.E.2d 661 (Ind.Ct.App. 1995), the Court of Appeals determined that such non-enforcement of a provision of an antenuptial agreement is not an unconstitutional impairment of contract under the state and federal constitutions. We agree and adopt their analysis of this issue. IND.APPELLATE RULE 11(B)(3). The Court of Appeals also affirmed the trial court's award of maintenance.

We granted transfer in order to examine the issue of when a trial court may choose to disregard all or part of a no-maintenance provision of an antenuptial agreement. We now reverse and remand.

## DISCUSSION

■ Antenuptial agreements are legal contracts which are entered into prior to marriage which attempt to settle the interest each spouse has in property of the other, both during the marriage and upon its termination. This court has long held antenuptial agreements to be valid contracts, as long as they are entered into freely and without fraud, duress, or misrepresentation, and are not unconscionable. *See Mallow v. Eastes,* 179 Ind. 267, 100 N.E. 836 (1913); *Kennedy v. Kennedy,* 150 Ind. 636, 50 N.E. 756 (1898); and *McNutt, v. McNutt,* 116 Ind. 545, 19 N.E. 115 (1888). These early cases drew a distinction between agreements which took effect upon the death of a spouse as opposed to those which took effect upon dissolution of the marriage. Those antenuptial agreements which involved application upon the death of a spouse were "favored by the law as promoting domestic happiness and adjusting property questions which would otherwise often be the source of fruitful litigation." *Buffington v. Buffington,* 151 Ind. 200, 51 N.E. 328, 329 (1898). However, the courts took a rather dim view of antenuptial agreements which limited the legal obligation of support upon dissolution of the marriage. *Watson v. Watson,* 37 Ind.App. 548, 77 N.E. 355 (1906).

Since these turn of the century cases, the number of subsequent marriages in our society has increased substantially. *See In re Marriage of Boren,* 475 N.E.2d 690, 693 (Ind.

1985). Individuals, especially those who have children from previous marriages, may wish to protect their property interests upon entering into a marriage. *Id.* at 694. In *Boren,* we concluded that policy reasons no longer compel us to find antenuptial agreements which take effect upon divorce to be void per se. Further, we held that the same traditional contract tests which apply to antenuptial agreements which take effect upon the death of a spouse also apply to antenuptial agreements pertaining to the dissolution of marriage. *Id. Boren* was the last time we addressed the issue of the validity of antenuptial agreements.

■ Since *Boren,* our Court of Appeals has had several occasions to address this issue. The leading case is *Justus v. Justus,* 581 N.E.2d 1265 (Ind.Ct.App.1991), *trans. denied.* In *Justus,* the Court of Appeals was presented with a situation where the couple entered into an antenuptial agreement freely, without fraud, duress, or misrepresentation. However, during the course of the marriage there was a change in circumstances, and the trial court would not enforce the agreement in its entirety. The Court of Appeals noted that

[a]s a general rule, a contract is unconscionable if there was a gross disparity in bargaining power which led the party with the lesser bargaining power to sign a contract unwillingly or unaware of its terms and the contract is one that no sensible person, not under delusion, duress or distress would accept. The doctrine of unconscionability necessarily looks to the time of execution.

*Id.* at 1272 (citations omitted).

However, the analysis did not stop there. The *Justus* court continued with a discussion of cases from other jurisdictions, focusing primarily on *Newman v. Newman,* 653 P.2d 728 (Colo.1982). In *Newman,* the Supreme Court of Colorado applied the above general contract analysis for property division, but would not do so for maintenance. For the latter, the *Newman* court found that such provisions may become voidable as unconscionable due to circumstances existing *at the time of dissolution.* 653 P.2d at 734–35.

In *Justus,* the Court of Appeals noted that we, in *Boren,* had cited approvingly to *Newman.* Further, the *Justus* court found that where enforcement of an antenuptial agreement would leave a spouse in the position where he would be unable to support himself, the state's interest in not having the spouse become a public charge outweighs the parties' freedom to contract. *Justus,* 581 N.E.2d at 1273. Therefore, the *Justus* court agreed that a court may look to circumstances at the time of dissolution to determine unconscionability of an antenuptial agreement.[2]

This view, that traditional contract law applies to antenuptial agreements unless unconscionable at time of dissolution, is a growing trend in this country. Many states have codified this view by adopting the UNIFORM PREMARITAL AGREEMENT ACT (1984) ("UPAA").[3] The UPAA reads in part:

> If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital

dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

UPAA § 6(b). In addition to the states which have adopted the UPAA, courts in a number of other jurisdictions have adopted a similar view.[4] Although the courts in most of these cases apply traditional contract law, they modify it to take account of unconscionability at the time of divorce. Along with the state's interest in keeping the spouse off of public assistance, reasons for modifying traditional contract law include the fact that the state has a special interest in marriage, *see, e.g., MacFarlane v. Rich,* 132 N.H. 608, 567 A.2d 585 (1989); that there is substantial likelihood that the contracting parties were not dealing at arms length, *see, e.g., Burtoff v. Burtoff,* 418 A.2d 1085 (D.C.1980); and that the state is a third party to any marriage contract, *see Gant v. Gant,* 174 W.Va. 740, 329 S.E.2d 106 (1985). Only a few states have adopted a contrary view.[5]

We are asked in this particular case to examine an antenuptial agreement which was not unconscionable when made, but due to a

---

2. The *Justus* court rejected the *Newman* property/maintenance distinction, noting that both property and maintenance provide for the future support of the spouse. *Justus,* 581 N.E.2d at 1274.

3. ARIZ.REV.STAT. §§ 25–201 to 25–205; ARK.CODE ANN. §§ 9–11–401 to 9–11–413; CAL.FAM.CODE §§ 1600 to 1617; HAW.REV.STAT. §§ 572D–1 to 572D–11; IDAHO CODE §§ 32–921 to 32–929; ILL. ANN.STAT. ch. 750, para. 10/1 to 10/11; IOWA CODE §§ 596.1 to 596.12; KAN. STAT. ANN. §§ 23–801 to 23–811; ME.REV.STAT. ANN. tit. 19, §§ 141 to 151; MONT.CODE ANN. §§ 40–2–601 to 40–2–610; NEB. REV.STAT. §§ 42–1001 to 42–1011; NEV REV.STAT. §§ 123A.010 to 123A.100; N.J. STAT. ANN. §§ 37:2–31 to 37:2–41; N.M. STAT. ANN. §§ 40–3A–1 to 40–3A–10; N.C. GEN.STAT. §§ 52B–1 to 52B–11; N.D. CENT.CODE §§ 14–03.1–01 to 14–03.1–09; OR.REV. STAT. §§ 108.700 to 108.740; S.D. CODIFIED LAWS §§ 25–2–16 to 25–2–25; TEX. FAM.CODE ANN. §§ 5.41 to 5.56; UTAH CODE ANN. §§ 30–8–1 to 30–8–9; VA.CODE ANN. §§ 20–147 to 20–155.

Rhode Island has also adopted a version of the UPAA, R.I. GEN. LAWS §§ 15–17–1 to 15–17–11, but its specific wording compels a somewhat different view. Due to the substitution of an "and" for an "or," Rhode Island's version requires proof of unconscionability *and* involuntariness. § 15–17–6(a). *See Penhallow v. Penhallow,* 649 A.2d 1016 (R.I.1994).

4. *See e.g., McHugh v. McHugh,* 181 Conn. 482, 436 A.2d 8 (1980); *Newman v. Newman,* 653 P.2d 728 (Colo.1982); *Burtoff v. Burtoff,* 418 A.2d 1085 (D.C.1980); *Scherer v. Scherer,* 249 Ga. 635, 292 S.E.2d 662 (1982); *Osborne v. Osborne,* 384 Mass. 591, 428 N.E.2d 810 (1981); *McKee–Johnson v. Johnson,* 444 N.W.2d 259 (Minn.1989); *MacFarlane v. Rich,* 132 N.H. 608, 567 A.2d 585 (1989); *Gross v. Gross,* 11 Ohio St.3d 99, 464 N.E.2d 500 (1984); *Bassler v. Bassler,* 156 Vt. 353, 593 A.2d 82 (1991); and *Gant v. Gant,* 174 W.Va. 740, 329 S.E.2d 106 (1985).

5. *Baker v. Baker,* 622 So.2d 541 (Fla.Dist.Ct.App. 1993) (holding that antenuptial agreements are enforceable even if one spouse would become a public charge. Courts should look only to the time of execution to determine unconscionability); *Simeone v. Simeone,* 525 Pa. 392, 581 A.2d 162 (1990) (holding that unconscionability should be determined at time of execution, that virtually all marriages involve change in circumstances, and this should not invalidate an otherwise valid contract); and *Penhallow,* 649 A.2d 1016 (interpreting Rhode Island's version of the UPAA to require unconscionability *and* involuntariness in order to avoid enforcement).

change in circumstances would operate to create a financial hardship for one spouse. We note that in 1995 Indiana joined the growing list of states which have adopted the UPAA. Indiana's version of the UPAA reads in relevant part:

If a provision of a premarital agreement modifies or eliminates spousal maintenance and the modification or elimination causes one (1) party to the agreement extreme hardship under circumstances not reasonably foreseeable at the time of the execution of the agreement, a court, notwithstanding the terms of the agreement, may require the other party to provide spousal maintenance to the extent necessary to avoid extreme hardship.

I.C. § 31–7–2.5–8(b). The Indiana statute did not take effect until July 1, 1995, and is therefore not applicable to this case. Still, the adoption of the UPAA provides useful guidance regarding the question of unconscionability, and supports the trend of applying traditional contract law unless the agreement is unconscionable at time of dissolution.

In this case, there is no evidence of fraud, duress, misrepresentation, or unconscionability at the time the contract was made. Leslie brought most of the property to the marriage; Charles brought few personal assets and a modest income from more than 35 years of work at the Delco Remy factory. Both were looking to protect their assets for themselves and for their heirs. Thus, the couple entered into an antenuptial agreement which would provide this protection. Even though at the time of marriage one spouse was close to retirement age and the other spouse had recently undergone several surgeries, the agreement was silent regarding support in the event that one spouse would become disabled. Given these circumstances, if such support had been important to either of the parties, surely it would have been included in the agreement. Rather, the agreement specifically stated that if the parties separated, neither would be entitled to support.

As discussed above, the trial court found that Leslie has assets worth between $65,000 and $85,000. However, due to her illness and her inability to work, she is not capable

of supporting herself. Thus, the trial court found that the agreement is "not binding" with regard to maintenance, and awarded Leslie $225/mo. The Court of Appeals agreed, finding that "[a]n antenuptial provision limiting or eliminating spousal maintenance is unconscionable and will not be enforced when it would deprive a spouse of reasonable support that he or she is otherwise unable to secure." *Rider*, 648 N.E.2d at 665.

However, both the trial court and the Court of Appeals failed to consider the relative financial positions of the spouses. Unconscionability involves a gross disparity. *See Justus*, 581 N.E.2d at 1272. Thus, while an antenuptial agreement which would force one spouse onto public assistance may be unconscionable, we believe that a finding of unconscionability requires a comparison of the situations of the two parties. At the time of divorce, Leslie's assets were worth at least $65,000, and she received $645/mo. child support from a prior spouse. Charles had personal assets which were worth only several thousand dollars and a pension which paid a gross $1,247/mo. Enforcement of the antenuptial agreement would leave one spouse with virtually all of the real and personal property, while leaving the other spouse with a modest income stream. This is what the parties brought into their short marriage, and this is what they sought to protect. The alternative, as ordered by the trial court, would provide Leslie with almost all of the property *and* a significant percentage of the income stream. Given Charles' limited financial position, we do not find enforcement of the parties' own agreement to be unconscionable.

We agree with the trial judge that Leslie should continue to pursue her claims for disability and social security. While we sympathize with her, and we understand that enforcement of this contract eventually may force her to sell her home, we cannot find enforcement of this antenuptial agreement to be unconscionable. Finally, we note that this case does not involve a situation where, following divorce, one spouse is left with considerable assets while the other spouse is left virtually penniless, with no means of support.

Rather, in this case, one party is left with a modest income stream, while the other party is left with a modest amount of real and personal property.

## CONCLUSION

This antenuptial agreement is enforceable. We remand to the trial court for action consistent with this opinion.

SHEPARD, C.J., and DeBRULER and DICKSON, JJ., concur.

SULLIVAN, J., dissenting, would deny transfer.