

FILED

Feb 26 2015, 9:00 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Chris M. Teagle
Muncie, Indiana

ATTORNEY FOR APPELLEE

Dale W. Arnett
Winchester, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Julie M. Fetters,

*Appellant-Petitioner,*

v.

Jay M. Fetters,

*Appellee-Respondent.*

February 26, 2015

Court of Appeals Cause No.
68A01-1404-DR-167

Appeal from the Randolph Superior
Court
Cause No. 68D01-1111-DR-1230

The Honorable Peter D. Haviza,
Judge

**Barnes, Judge.**

# Case Summary

Julie Fetters appeals the trial court's division of property in her divorce from Jay Fetters, following its decision to enforce a premarital agreement into which the parties entered. We reverse and remand.

# Issue

The restated issue before us is whether the premarital agreement is unconscionable.

# Facts

Julie and Jay began having a sexual relationship in 1994, when Julie was fourteen years old and Jay was twenty-nine. Jay was a school janitor at the time, but Julie did not go to his school. In the summer of 1995, when Julie was fifteen, she became pregnant by Jay, who was then thirty. Police began investigating Jay for sexual misconduct with a minor. Jay believed he could avoid prosecution if he married Julie, and Julie agreed to do so.

Before getting married, Jay asked Julie, who had just turned sixteen, to sign a premarital agreement prepared by his attorney. Among other things, the agreement provided that each party would retain their own separate property in the event of divorce. Julie went to Jay's attorney's office with her mother, where Jay's attorney went over the document with her. Despite not being able to read very well and not understanding the agreement, Julie agreed to sign it;

her mother also signed it. Julie did not have an attorney of her own review the document. Jay was never prosecuted for his relationship with Julie.

[5] Julie dropped out of school when she got married, and she had the couple's first child in the spring of 1996. The couple had a second child in 2003. Julie never obtained her GED and worked in various low-wage jobs during about half the marriage and exclusively cared for the children during the other half. In 2011, Julie filed a petition for dissolution of the marriage. She sought to disavow the premarital agreement and have it declared void by the trial court.

[6] Jay has continued working as janitor, earning approximately $590 per week and accumulating a PERF pension worth approximately $38,000. Julie works as a nurses' aide, earning approximately $9.85 per hour and working fifteen to thirty-five hours per week, and has no retirement plan. During the marriage, the couple lived in a home Jay had acquired before marriage and which had a value at the time of separation of $62,000. Julie, who owned no property at the time of the marriage, had acquired two vehicles in her name during it worth a total of $13,900; Jay owned two vehicles and one motorcycle in his own name, worth a total of $8,500.

[7] The trial court denied Julie's request to invalidate the premarital agreement. Thus, in accordance with the agreement, it entered a final dissolution decree awarding the full value of the marital residence and Jay's PERF pension to him, along with his vehicles, while awarding Julie her own vehicles. Julie now appeals.

# Analysis

[8] The trial court here entered findings and conclusions to accompany its dissolution decree. However, it does not appear that either party requested such findings in accordance with Indiana Trial Rule 52(A). "In such a situation, the specific factual findings control only the issues that they cover, while a general judgment standard applies to issues upon which there are no findings." *Stone v. Stone*, 991 N.E.2d 992, 998 (Ind. Ct. App. 2013), *aff'd on r'hg*. Not every finding needs to be correct, and even if one or more findings are clearly erroneous, we may affirm the judgment if it is supported by other findings or is otherwise supported by the record. *Id.* "We may affirm a general judgment with sua sponte findings upon any legal theory supported by the evidence introduced at trial." *Id.* Sua sponte findings control as to the issues upon which the court has found, but do not otherwise affect our general judgment standard of review, and we may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court. *Id.*

[9] When reviewing the accuracy of findings entered sua sponte, we first consider whether the evidence supports them. *Id.* Next, we consider whether the findings support the judgment. *Id.* We will disregard a finding only if it is clearly erroneous, meaning the record contains no facts to support it either directly or by inference. *Id.* We will not reweigh the evidence or judge witness credibility. *Id.* at 999. "A judgment also is clearly erroneous if it relies on an

incorrect legal standard, and we do not defer to a trial court's legal conclusions." *Id.* at 998-99.

[10] Premarital agreements have long been recognized as valid contracts in Indiana, "as long as they are entered into freely and without fraud, duress, or misrepresentation, and are not unconscionable." *Rider v. Rider*, 669 N.E.2d 160, 162 (Ind. 1996). Our legislature codified this caselaw approval of premarital agreements with its adoption in 1995 of a version of the Uniform Premarital Agreement Act ("the Act"), now found at Indiana Code Chapter 31-11-3.[1] The Act went into effect in Indiana on July 1, 1995, and so it applies to this case. *See id.* at 164. In part, the Act states:

> (a) A premarital agreement is not enforceable if a party against whom enforcement is sought proves that:
>> (1) the party did not execute the agreement voluntarily; or
>> (2) the agreement was unconscionable when the agreement was executed.
>
> * * * * *
>
> (c) A court shall decide an issue of unconscionability of a premarital agreement as a matter of law.

Ind. Code § 31-11-3-8.[2] No reported Indiana decision has interpreted the Act since its adoption. It would appear, however, that we may look to existing

---

[1] For over a century, Indiana courts have referred to premarital agreements as "antenuptial" agreements. *See McNutt v. McNutt*, 116 Ind. 545, 19 N.E. 115 (1888); *Rider*, 669 N.E.2d 160. They have continued to do so even after the Act's codification. *See Schmidt v. Schmidt*, 812 N.E.2d 1074 (Ind. Ct. App. 2004). However, in the Act, the term "premarital agreement" is used throughout. *See* Ind. Code § 31-11-3-2. Because the Act is applicable to this case, will use the term premarital agreement throughout this opinion.

[2] Subsection (b) of this statute relates to spousal maintenance, which is not at issue in this case.

Indiana caselaw on premarital agreements so long as it does not conflict with the Act. Additionally, we may look for guidance from the official comments to the Uniform Act, as well as decisions from other jurisdictions that have adopted it. *See Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 246 (Ind. Ct. App. 2001) (looking for guidance from other jurisdictions that adopted Uniform Trade Secrets Act), *trans. denied*.

[11] Standard principles regarding contract formation and interpretation apply to premarital agreements. *Schmidt v. Schmidt*, 812 N.E.2d 1074, 1080 (Ind. Ct. App. 2004). Generally, "'a contract is unconscionable if there was a gross disparity in bargaining power which led the party with the lesser bargaining power to sign a contract unwillingly or unaware of its terms and the contract is one that no sensible person, not under delusion, duress or distress would accept.'" *Rider*, 669 N.E.2d at 162 (quoting *Justus v. Justus*, 581 N.E.2d 1265, 1272 (Ind. Ct. App. 1991), *trans. denied*). This standard is consistent with the intent of the drafters of the Uniform Act, which believed unconscionability "includes protection against one-sidedness, oppression, or unfair surprise . . . ." Uniform Premarital Agreement Act § 6, cmt. (2001). Also relevant are "the economic circumstances of the parties resulting from the agreement, and any other relevant evidence such as the conditions under which the agreement was made, including the knowledge of the other party." *Id.* The lack of assistance from independent legal counsel may be another factor to consider in deciding unconscionability. *Id.*

[12] We also observe that the Act makes the issue of unconscionability a question of law. This means that our review of the trial court's ultimate ruling on unconscionability is de novo. *See Rivera v. Rivera*, 243 P.3d 1148, 1154 (N.M. App. 2010) (applying New Mexico version of the Act). Underlying that legal determination may be factual determinations regarding the circumstances surrounding execution of the agreement, which we review for clear error as we would any other factual determination. *See id.* (applying New Mexico standard of "substantial evidence" for factual findings).

[13] Here, the facts are largely undisputed. Indeed, in his brief Jay expressly agrees with Julie's statement of the facts in her brief, with one exception. Namely, it is undisputed here that Jay commenced an illicit sexual relationship with Julie when she was fourteen years old and he was twice her age. When Julie became pregnant when she was fifteen, Jay found himself under police investigation for his conduct. In a successful attempt to evade prosecution, Jay proposed marriage to Julie, and she accepted. However, he also asked Julie to sign a premarital agreement disavowing any claim to any of his property, no matter how long they stayed married. Julie, being just sixteen years old, had no property of her own at the time and would accumulate very little during the marriage. She also dropped out of school upon marrying Jay and having their first child and has not since obtained her GED. Julie did not obtain independent legal advice regarding the premarital agreement, and she had difficulty understanding it in part because of her own poor reading skills. The only matter of dispute between the parties is whether Jay's attorney read the

document to Julie as opposed to a legal secretary. We will assume the facts in a light most favorable to the judgment, specifically that Jay's attorney personally went over the document with Julie before she and her mother signed it. That slight difference in the facts, however, has little impact on our analysis.

[14] We have not discovered any case remotely similar to this one, either in Indiana or elsewhere. We readily conclude that this premarital agreement is unconscionable as a matter of law. Although it does not appear Jay is highly educated, there still was a gross disparity in life experience between him and Julie. Indeed, Jay apparently violated criminal laws intended to protect minors by carrying out his illicit sexual relationship with Julie. *See* I.C. § 35-42-4-9 (1995) (defining crime of sexual misconduct with a minor but providing as defense that child is married). And, he personally benefitted greatly by marrying Julie and avoiding prosecution, with no comparable benefit to Julie. Rather, Julie dropped out of school and did not further her education, while either caring for the couple's children or working at low-wage jobs. Also, the property division portion of the agreement was entirely one-sided in Jay's favor, as he was the only party bringing any assets into the marriage.

[15] Furthermore, Indiana law has long held that contracts entered into by a minor are voidable at the option of the minor while he or she remains a minor, or within a reasonable time after reaching majority. *See Wiley v. Wilson*, 77 Ind. 596, 598 (1881); *Bowling v. Sperry*, 133 Ind. App. 692, 694, 184 N.E.2d 901, 902 (1962). This reflects the law's view that minors are not always entirely competent to enter into contracts with adults and are deserving of special

protection in that regard. Although Julie was permitted to marry Jay at age sixteen,[3] she still was a minor for purposes of contract formation. The current age of majority in Indiana is eighteen. *See* I.C. § 1-1-4-5(1). Even if we were to assume that Julie did not act promptly enough after reaching majority to disavow the premarital agreement in accordance with the *Wiley* case,[4] we still believe it is highly relevant to consider that she was a minor when she entered into the agreement.

[16] Finally, we note Julie's lack of education, her difficulty reading, her stated lack of understanding of the premarital agreement, and the fact that she did not receive independent legal advice. It is true that Jay likewise appears not to be highly educated and it is possible he also did not understand all of the agreement's intricacies. But, it was his attorney who prepared the agreement, and it is entirely in his favor. We also do not believe that Julie's mother's advice and consent regarding the premarital agreement was an adequate substitute for professional legal advice.

[17] In sum, after considering all of the circumstances surrounding the premarital agreement's execution and its one-sided nature in favor of the dominant party,

---

[3] Julie was permitted to marry at age sixteen in contravention of the general minimum marital age of eighteen, or sometimes seventeen, because she was pregnant by Jay, was at least fifteen years old, and received parental consent to marry. *See* I.C. § 31-7-1-7 (1995).

[4] As a practical matter, it is unclear how Julie could have unilaterally disavowed the premarital agreement while still remaining married to Jay. The agreement could have been withdrawn if both parties agreed to it in writing, however. *See* I.C. § 31-11-3-7.

Jay, we conclude that the agreement was unconscionable at the time of its execution. Premarital agreements traditionally have been looked upon favorably in Indiana. *See Boetsma v. Boestma*, 768 N.E.2d 1016, 1024 (Ind. Ct. App. 2002). However, we refuse to accept that this agreement is conscionable.[5]

[18] Having found the premarital agreement unconscionable, we must also address the trial court's alternate conclusion that Julie is "barred by laches and estoppel" from challenging the agreement because she failed to disavow the agreement for nearly fourteen years after she turned eighteen. App. p. 50. For this proposition the trial court cited *Estate of Palamora v. Palamora*, 513 N.E.2d 1223 (Ind. Ct. App. 1987), and stated that Julie could not "accept[] the benefits of the marriage" and later attempt to disavow the premarital agreement. *Id.* The trial court misapplied the holding of *Palamora*. In that case, a man dying of cancer agreed to marry, but only on the condition that his wife-to-be execute a premarital agreement that would provide her with an income of $1,000 per month for the rest of her life from a trust to be established by the agreement, but

---

[5] It is unclear under the Act whether we may consider the agreement's unconscionability at the time of dissolution, as opposed to the time of execution. There may be a conflict between the Act and caselaw on this point. Cases have held, "an otherwise valid antenuptial agreement may become voidable as unconscionable due to circumstances existing at the time of the dissolution." *Pond v. Pond*, 700 N.E.2d 1130, 1132 n.3 (Ind. 1998) (citing *Rider*, 669 N.E.2d at 162–64 (Ind. 1996)). The Act, however, states that courts should consider whether "the agreement was unconscionable when the agreement was executed." I.C. § 31-11-3-8(a)(2). Because we have concluded that the agreement here was unconscionable at the time of execution, we need not resolve this possible conflict. Regardless, we do note that, although the marital estate here is not especially large, the agreement has resulted in Jay receiving an overwhelming percentage of what would have been divisible marital property in the absence of the agreement. After fifteen years of marriage, Jay has received assets worth approximately $108,500 while Julie has received assets worth approximately $13,900. Jay also has a steady full-time job with reliable income that he has held for many years and which includes retirement benefits; Julie's job is variable in hours, pays considerably less per hour, and does not provide retirement benefits.

she would otherwise receive nothing upon the husband's death. After the husband died, the wife received and spent several payments from the trust and then attempted to disavow the premarital agreement. Under these circumstances, we held the wife could not accept the benefits of the premarital agreement and later seek to repudiate the agreement. *Palamora*, 513 N.E.2d at 1228. Thus, in *Palamora*, it was not the fact that the wife accepted the benefits of *marriage* that prevented her from repudiating the premarital agreement; it was her acceptance of *payments from the trust* established by that agreement that prevented her from doing so. Here, Julie did not accept any material benefits from the premarital agreement; the fact that she did marry and remained married to Jay did not preclude her from attempting to disavow it.

[19]     We also note the following language in the Act: "Any statute of limitations applicable to an action asserting a claim for relief under a premarital agreement is tolled during the marriage of the parties to the agreement. However, equitable defenses limiting the time for enforcement, including laches and estoppel, are available to either party." I.C. § 31-11-3-10. In order to establish laches, a party must prove: "(1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances resulting in prejudice to the adverse party." *Indiana Real Estate Comm'n v. Ackman*, 766 N.E.2d 1269, 1274 (Ind. Ct. App. 2002). The mere passage of time by itself is insufficient to prove laches. *Id.* Similarly, estoppel is an equitable doctrine "by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who

was entitled to and did rely on the conduct." *Brown v. Branch*, 758 N.E.2d 48, 51-52 (Ind. 2001). We believe it is clear from the statutory language, along with the caselaw definitions of laches and estoppel, that the mere fact that Julie stayed married to Jay from approximately fifteen years and did not attempt to disavow the premarital agreement before she filed for divorce is not a bar to her disavowal. Rather, there must at least be some evidence or proof of Jay's detrimental reliance on Julie's failure to disavow the agreement, and there is none in this case. The trial court erred in concluding that Julie's claim was barred by laches and/or estoppel.

## Conclusion

[20] The trial court erred in concluding that the parties' premarital agreement is not unconscionable and that Julie is time-barred from challenging it. We conclude that the agreement is unconscionable, Julie is not barred from challenging it, and it therefore is void. We reverse the trial court's division of property in the parties' dissolution and remand for the trial court to divide the marital property in a manner consistent with the general laws governing such division.

[21] Reversed and remanded.

May, J., and Pyle, J., concur.