

**FILED**

Jul 08 2015, 8:53 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEYS FOR APPELLANT | ATTORNEY FOR APPELLEES |
|---|---|
| Jeffrey C. Gerish<br>Plunkett Cooney<br>Bloomfield Hills, Michigan | Michael J. Lewinski<br>Ice Miller LLP<br>Indianapolis, Indiana |
| Pamela A. Paige<br>J. Dustin Smith<br>Plunkett Cooney<br>Indianapolis, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| 2513-2515 South Holt Road Holdings, LLC, | July 8, 2015 |
| *Appellant-Plaintiff*, | Court of Appeals Case No. 49A02-1407-MF-525 |
| v. | Appeal from the Marion Superior Court |
| Holt Road, LLC, Res Holt Road, LLC, MSP Holt Road, LLC, K3D Holt Road, LLC, and Roll & Hold Warehousing & Distribution Corp., | The Honorable Cynthia J. Ayers, Judge |
| *Appellees-Defendants*. | Cause No. 49D04-1307-MF-27337 |

**Brown, Judge.**

[1] 2513-2515 South Holt Road Holdings, LLC ("Lender") appeals the trial court's Final Judgment Regarding Tax Refunds in favor of Holt Road, LLC, Res Holt Road, LLC, MSP Holt Road, LLC, K3D Holt Road, LLC, and Roll & Hold Warehousing & Distribution Corp. (collectively, "Borrowers"). Lender raises one issue, which we revise and restate as whether the court erred in ruling that the Lender is not entitled to recover certain property tax refunds received by Borrowers. We reverse and remand.[1]

## Facts and Procedural History

[2] Borrowers were the record owners of real property located in Marion County commonly known as 2513-2515 South Holt Road, Indianapolis, Indiana (the "Real Estate"). On December 21, 2006, Borrowers executed and delivered to Wachovia Bank, National Association ("Wachovia") a certain Promissory Note in the original principal amount of $5,094,240, which was amended by an Amendment to Promissory Note dated May 25, 2010 (collectively, the "Note"). In connection with the execution of the Note, Borrowers executed a Mortgage, Security Agreement and Fixture Filing dated December 21, 2006, and recorded January 3, 2007, and an Amendment to Mortgage, Security Agreement and Fixture Filing dated May 25, 2010, and recorded June 1, 2010 (collectively, the "Mortgage"). In addition, other documents related to the loan were executed including: (A) an Assignment of Leases and Rents dated December 21, 2006,

---

[1] On June 22, 2015, we held oral argument in Indianapolis. We commend counsel for their effective advocacy.

and recorded January 3, 2007; (B) a Lockbox Account and Security Agreement dated December 10, 2009; (C) a Cash Management Agreement dated December 10, 2009, which was amended by an Amendment to Cash Management Agreement dated May 25, 2010; and (D) an Amendment to Loan Documents dated May 25, 2010 (the Note, Mortgage, and documents listed in (A)-(D) collectively, the "Loan Documents"). Wachovia's rights and interest in and by the Loan Documents were ultimately assigned to Lender through various assignments.

[3] Borrowers defaulted under the terms of the Note by failing to make payments beginning in May 2013, and no loan payment has been made since April 2013. As of July 2013, there was due and owing to Lender under the Loan Documents the principal amount of $5,013,663.00, plus $70,464.25 in interest, $28,410.57 in default interest, $4,496.48 in late charges, $840.62 in property protective advances, $859,532.26 in prepayment premiums, $345.00 in administrative fees, and $5,414.37 in legal fees, less a combined escrow offset of $247,181.76. Thus, the total due was $5,735,984.79, plus interest at the default rate of 12.06 percent per annum accruing from and after July 1, 2013.

[4] The loan evidenced by the Note is a limited recourse loan and specifically provides in § 3.6, titled "Exculpation," as follows:

> (a) Borrower shall be liable upon the indebtedness evidenced hereby and for the other obligations arising under the Loan Documents to the full extent (but only to the extent) of the security therefor, the same being all properties (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of this

Note and/or the other obligations of Borrower under the Loan Documents (collectively, the "***Property***");

(b) if a default occurs in the timely and proper payment of all or any part of such indebtedness evidenced hereby or in the timely and proper performance of the other obligations of Borrower under the Loan Documents, any judicial proceedings brought by Lender against Borrower shall be limited to the preservation, enforcement and foreclosure, or any thereof, of the liens, security titles, estates, assignments, rights and security interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, and no attachment, execution or other writ of process shall be sought, issued or levied upon any assets, properties or funds of Borrower other than the Property, except with respect to the liability described below in this section; and

(c) in the event of a foreclosure of such liens, security titles, estates, assignments, rights or security interests securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents, no judgment for any deficiency upon the indebtedness evidenced hereby shall be sought or obtained by Lender against Borrower, except with respect to the liability described below in this section; provided, however, that notwithstanding the foregoing provisions of this section, Borrower shall be fully and personally liable and subject to legal action . . . (v) for rents, issues, profits and revenues of all or any portion of the Property received or applicable to a period after the occurrence of any Event of Default hereunder or under the Loan Documents which are not either applied to the ordinary and necessary expenses of owning and operating the Property or paid to Lender . . . .[2]

---

[2] Subsection (c) contains a recitation of numerous potential acts by which the Borrowers could become fully and personally liable. The parties agree that none of the provisions contained in subsection (c) are applicable in this case.

Appellant's Appendix at 40-41. The Mortgage contains a number of categories of "Property" that secure the loan listed as Paragraphs (A)-(P) and specifically includes the following:

> . . . BORROWER HEREBY IRREVOCABLY MORTGAGES, GRANTS, BARGAINS, SELLS, CONVEYS, TRANSFERS, PLEDGES, SETS OVER AND ASSIGNS . . . all of Borrower's estate, right, title and interest in, to and under any and all of the following described property, whether now owned or hereafter acquired by Borrower (collectively, the "*Property*"):
>
> * * * * *
>
> (H)  All leases . . . license, concessions and occupancy agreements of all or any part of the Premises or the Improvements . . . now or hereafter entered into and all rents, royalties, issues, profits, bonus money, revenue, income, rights and other benefits (collectively, the "***Rents and Profits***") of the Premises or the Improvements, now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future Lease or other agreement pertaining thereto or arising from any of the Leases or any of the General Intangibles (as hereinafter defined) . . . subject, however, to the provisions contained in <u>Section 2.7</u> hereinbelow; . . .
>
> * * * * *
>
> (K) All present and future funds . . . claims, general intangibles (including, without limitation, trademarks, trade names, service marks and symbols now or hereafter used in connection with any part of the Premises or the Improvements, all names by which the Premises or the Improvements may be operated or known, all rights to carry on business under such names, and all rights, interest and privileges which Borrower has or may have as developer or declarant under any covenants, restrictions or declarations now or hereafter relating to the Premises or the Improvements) and all notes or chattel paper now or hereafter arising from or by virtue of any transactions related to the Premises or the Improvements (collectively, the "***General Intangibles***"); . . .
>
> * * * * *

(P) All other or greater rights and interests of every nature in the Premises or the Improvements and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Borrower.

*Id.* at 62, 64.

[5] On July 12, 2013, Lender filed its Complaint For Judgment and Foreclosure of Commercial Mortgage and Security Interest against Borrowers.[3] Borrowers acknowledged that default had occurred and cooperated with Lender in having a receiver appointed over the Real Estate in October 2013, and on January 24, 2014, the court issued a Consent Order Granting *In Rem* Judgment and Decree of Foreclosure of the Real Estate (the "Foreclosure Decree"). In the Foreclosure Decree, the court specifically found:

> The parties agree that absent liability under Paragraph 3.6 (c) of the Note (the "Limited Recourse Provisions"), [Lender's] collection of its judgment herein shall be limited to the Mortgaged Property and no judgment for any deficiency, if any, shall be pursued by [Lender] or entered by the Court against any Defendant, guarantor, indemnitor, or any individual member, owner or partner of any of the [Borrowers]. Nothing herein precludes [Lender] from seeking a judgment on the deficiency, if any, against [Borrowers] or any guarantors, if [Lender] later determines liability exists under the Limited Recourse Provisions.

---

[3] The Complaint is not contained in the record on appeal.

Appellees' Appendix at 34. The Real Estate was subsequently sold to Lender at a Sheriff's sale for $2.7 million, or less than the amount in the Foreclosure Decree, thereby resulting in a deficiency.

[6] Meanwhile, in November 2013, while the foreclosure proceedings were pending, Borrowers notified Lender that they had obtained $307,193.76 from the Marion County Treasurer as a refund from an appeal of real estate taxes relating to tax years 2008-2011 (the "Tax Refunds").[4] The parties disputed whether the Tax Refunds should be distributed to Borrowers or Lender, Borrowers deposited said Tax Refunds into an escrow account with the court, and on December 9, 2013, the parties filed briefs on the issue. On May 14, 2014, the court held a hearing on the issue and heard argument, and at the conclusion of the hearing it asked the parties to submit proposed orders. On July 3, 2014, the court issued its Final Judgment Regarding Tax Refunds (the "Final Judgment") in which it concluded that the Tax Refunds should be retained by Borrowers. The Final Judgment stated in part:

> 7. [Borrowers] asserted that none of the loan documents explicitly gave [Lender] a security interest in the Tax Refunds. In the alternative, [Lender] contended that the Tax Refunds, although not referenced in the loan documents and notwithstanding the lack of specific language, should have been included, as a part of their security interest, under the definition of "general intangibles."

---

[4] Specifically, Borrowers were refunded various amounts corresponding with the following tax years: (A) $93,512.72 for tax year 2008; (B) $78,410.31 for tax year 2009; (C) $73,684.48 for tax year 2010; and (D) $69,674.45 for tax year 2011. The subtotal amount for those refunds of $315,281.96 was reduced by $8,088.20 for legal costs, resulting in a refund of $307,193.76.

8. Ind. Code § 26-1-9.1-102(42) provides: "General intangible" means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." [sic] While [Lender] lists numerous bankruptcy cases which include tax refunds under the general intangible definition, the instant case is not a bankruptcy; it is a case involving the default of a limited recourse loan. The precedent supplied by [Lender] concerning bankruptcy "general intangible" concepts are inapplicable to this case.

9. [Lender] also claimed that the Lock Box Agreement and Cash Management Agreement, in its comprehensive restrictions on the use of rents collected by [Borrowers], served to capture all monies received by [Borrowers] after Default. The Lock Box Agreement covered "all rents and profits to be deposited in the "Cash Collateral Account". [sic] [Lender] argued that the Lockbox Agreement "simply gave [Lender] more control over the already secured funds." However, the Tax Refunds were not rents or profits and therefore would not have been placed into the Lock Box.

10. [Borrowers] further argued that they should be able to keep the tax refunds returned to them by the Marion County Treasurer because it was money they never should have paid in the first place and that the refunds represented personal funds not subject to seizure by [Lender] in this limited recourse transaction.

11. To counter that argument, [Lender] contended that [Borrowers] agreed "they would be liable for 'rents, issues, profits, and revenues of all or any portion of the Property received or applicable to a period *after* the occurrence of any Event of Default hereunder or of owning and operating the Property or paid to Lender …" However, their interpretation of that language did not account for the fact that the Tax Refunds were received after the 2013 Event of Default, but were accrued before the default, the refunds were not truly income of the property but were, instead, a reimbursement of monies paid from rent. Tax refunds were never proffered to secure the payment of this Note and/or any other obligations of Borrower pursuant to the loan agreement.

12. [Lender] further argued that even if the Court found no security interest in the Tax Refunds, good public policy should not allow [Borrowers] to walk away from its loan obligations, with money in hand, since the loan was in default. But for the restrictive language in the limited recourse agreement, [Lender] would be correct, policy-wise. However, the parties bargained for certain limited recourse terms and the contract did not include a provision for [Lender] to own a security interest in a tax refund returned to [Borrowers] after a default.

13. In order to include the Tax Refunds in the definition of security, the Court would be obliged to rewrite the contract when the parties did not negotiate for the inclusion of such refunds. . . .

*Id.* at 8-10.

[7] On July 21, 2014, the parties agreed to a Consent Order to Maintain Funds Pending Appeal in which Borrowers were ordered to place the Tax Refunds in an interest bearing account and not withdraw or disburse any of the funds "pending resolution of the Appeal, an agreement between the parties, or further order of the Court." *Id.* at 13.

## *Discussion*

[8] The issue is whether the court erred in ruling that Lender is not entitled to recover the Tax Refunds. The trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied*. In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are

clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999). We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Kwolek v. Swickard*, 944 N.E.2d 564, 570 (Ind. Ct. App. 2011) (citing *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*), *trans. denied*.

[9] "When interpreting a contract, our paramount goal is to ascertain and effectuate the intent of the parties." *Stewart v. TT Commercial One, LLC*, 911 N.E.2d 51, 56 (Ind. Ct. App. 2009), *trans. denied*. "Interpretation of a contract is a pure question of law and is reviewed de novo." *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 252 (Ind. 2005). If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Id.* Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id.* "We will make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Rogers v. Lockard*, 767 N.E.2d 982, 992 (Ind. Ct. App. 2002). "A contract will be found to be ambiguous only if reasonable

persons would differ as to the meaning of its terms." *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002), *reh'g denied*. "When a contract's terms are ambiguous or uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the factfinder." *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010).

[10]  Lender argues that the security interest described in the Loan Documents employs language which is extremely broad and extends to any money having any connection with the premises. Lender specifically points to § 3.6(a) of the Note and Paragraphs (K) and (P) of "Property" from the Mortgage and argues that "[t]he clear intent of the parties in connection with the Mortgage was to allow [Lender] to recover any money having anything to do with the Real Estate in the event of a default." Appellant's Brief at 11. Lender argues that Borrowers and the court "placed too much emphasis on the limited-recourse nature of the Note" and that "[t]he fact that the Note is limited recourse means only that [Lender] cannot seize on assets that are unrelated to the Real Estate, or that otherwise do not constitute collateral." *Id.* at 12.

[11]  Lender directs our attention to four categories of Property described in the Mortgage as alternative bases for reversal. The first three categories are described in Paragraph (K). Specifically, Lender argues that the Tax Refunds "clearly constitute[] 'funds,'" under that paragraph and cites to various dictionary definitions, including "available pecuniary resources" and "[a]vailable money; ready cash: *short on funds*." Appellant's Brief at 13 (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2001); AMERICAN

HERITAGE (4th ed. 2006)). Lender maintains that Borrowers and the court have each characterized the Tax Refunds as "funds" and asserts that "there can be no serious argument that the [Tax Refunds] do not constitute 'funds' under the plain, ordinary meaning of that word." *Id.* at 14. Lender further maintains that the Tax Refunds "clearly meet[] the description 'now or hereafter arising from or by virtue of any transactions related to the premises,'" and it notes that "transaction" is defined as "an exchange or transfer of goods, services, or funds . . . ." *Id.* Lender next asserts that it has a security interest in the Tax Refunds because their interest extends to "claims" under Paragraph (K), arguing that "[e]ven before the tax refund was issued to [Borrowers], it constituted a 'claim' to which [Lender] held a security interest" which "clearly arose from or by virtue of a transaction related to the Premises." *Id.* at 15. Lender notes that Ind. Code § 6-8.1-9-1 provides that "a person seeking a tax refund 'may file a *claim* for a refund with the department.'" *Id.* Lender further asserts that if this court decides that the Tax Refunds do not "constitute 'funds' or 'money,' then it most certainly constitutes a 'general intangible'" and cites to certain bankruptcy cases which find that tax refunds qualify as general intangibles. *Id.* at 17. Finally, Lender argues that Paragraph (P) operates as "a catch-all provision" and grants Lender a security interest in the Tax Refunds should the language of Paragraph (K) not apply. *Id.* at 18.

[12] Borrowers argue that the Mortgage gives Lender a security interest in certain property which is "defined at great length, and with specificity, in the first three pages of the Mortgage" and that "[n]otably absent from the definition of

'Property' is any mention of property tax refunds." Appellees' Brief at 10-11. Borrowers contend that the categories of Property in the Mortgage including funds, claims, or general intangibles "are qualified by the language: 'arising from or by virtue of any transactions related to the Premises or the Improvements'" and that "[c]ontrary to [Lender's] assumption, the refund of an overpayment of property taxes is not a 'transaction' related to the premises." *Id.* at 16. They direct the court's attention to the definition of "transaction" found in Black's Law Dictionary and argue that "[t]he government's obligation to refund an overpayment of taxes" does not meet the definition "in the traditional legal and commercial use of that term." *Id.* They assert that "[i]t is not an act or instance of conducting business, let alone an act in the formation, performance, or discharge of a contract," that "[i]t is not a business agreement or exchange," and that it "is not an activity involving two or more persons." *Id.* at 16-17. Borrowers also assert that if Paragraph (P) "was as broad as [Lender] argues, it would have the effect of making the bargained-for limited recourse essentially meaningless." *Id.*

[13] Borrowers specifically argue that the limited recourse nature of the obligation stated in § 3.6 of the Note prevents Lender from recovering the Tax Refunds to reduce any deficiency because the Property Tax Refunds are a personal asset which they would have retained had Marion County not erred in its original assessment, and accordingly the Loan Documents do not entitle Lender to collect those funds. They highlight the trial court's conclusion that the Tax Refunds "were not truly income of the property but were[] instead a

reimbursement of monies paid from rent" and note further that the subsequent agreements in the Loan Documents did not alter this conclusion. *Id.* Borrowers assert that "[f]or example, even though rents are included in the definition of security, [they] had an absolute right to use rent income as they deemed appropriate – including distributions to themselves – at any time prior to an event of default" and that "[u]nder the Assignment, [Borrowers were] explicitly granted 'a revocable license by Lender, to retain possession of the Leases and to collect, retain, use and distribute and enjoy the Rents unless and until there shall be an Event of Default . . . .'" *Id.* at 19-20. They argue that it would have been inequitable for the trial court to ignore the clear intent of the Note to exclude personal assets from the security interest, and that Lender "received what it bargained for in the event of a default – ownership of the real estate and the benefit of rents collected after the default." *Id.* at 21.

[14] Lender responds that Borrowers implicitly concede that the tax refund constitutes 'funds,' and that Borrowers' claim to the refund constituted a 'claim,' by presenting no argument to the contrary and instead challenging whether the issuance of the property tax refund constituted a 'transaction,' which "is without merit on its face." Appellant's Reply Brief at 3-4. Lender maintains that the refund qualifies under the language of the Mortgage as "arising from or by virtue of any transactions related to the Premises" under the Black's Law Dictionary definition of "transaction" suggested by Borrowers as "[s]omething performed or carried out" or "[a]ny activity involving two or more persons." *Id.* at 4. Lender further asserts that "the use of the phrase 'or

by virtue of' . . . means that the [Tax Refunds] fall within the description so long as [Borrowers'] initial *payment* of the property taxes constituted a 'transaction[s] related to the Premises'—which clearly it did." *Id.* at 5.

### *Decision*

We begin with Lender's contentions that the Tax Refunds are within its security interest because they qualify as "funds," "claims," or "general intangibles" under Paragraph (K) of the Mortgage, and we agree that the Tax Refunds qualify as "funds" under the plain and ordinary meaning of the term. As noted by Lender, the American Heritage Dictionary defines the term "funds" as "[a]vailable money; ready cash: *short on funds*." AMERICAN HERITAGE DICTIONARY 712 (4th ed. 2006). Borrowers were issued a check for the Tax Refunds from the Marion County Treasurer in the amount of $307,193.76, which constituted money or funds available to them. Also, as observed by Lender, Borrowers do not articulate a reason why the Tax Refunds do not meet the plain and ordinary meaning of the term "funds."

In order for the Tax Refunds to fall within Paragraph (K), though, such funds must have arisen "from or by virtue of any transactions related to the Premises or the Improvements." First, to the extent the parties dispute the meaning of the term "transaction," we observe that the Loan Documents themselves do not define the term. Black's Law Dictionary defines transaction as follows:

> 1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. 2. Something performed or carried out; a business agreement or

exchange. 3. Any activity involving two or more persons. 4. Civil law. An agreement that is intended by the parties to prevent or end a dispute and in which they make reciprocal concessions. La. Civ. Code art. 3071.

BLACK'S LAW DICTIONARY 1726 (10th ed. 2014).

[17] Additionally, we observe that the Indiana Supreme Court has previously discussed the definition of "transaction" in the context of the meaning of that term for purposes of counterclaims:

> The word "transaction" has been defined as "the management or settlement of an affair," Century Dict. "That which is done." Webster's Dict. "Transacting or conducting any business; negotiation; management; a proceeding." Worcester's Dict. "Transaction, as ordinarily employed, is understood to mean the doing or performing of some matter of business between two or more persons." It is not confined to what is done in one day or at a single time or place.

*Muir v. Robinson*, 205 Ind. 293, 299-300, 186 N.E. 289, 292 (1933); *see also Middelkamp v. Hanewich*, 173 Ind. App. 571, 588, 364 N.E.2d 1024, 1035 (1977) ("'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon their connection as upon their logical relationship." (quoting *Moore v. N.Y. Cotton Exchange*, 270 U.S. 593, 610, 46 S. Ct. 367, 371 (1926))).

[18] Although the context in which the term "transaction" is different from that of *Muir*, we find the Court's statements, relying on various dictionary definitions, to be instructive here. We find that the payment of property taxes is something "which is done," falls within the scope of the management of an affair, and is

an activity involving two or more "persons," the Borrowers and Marion County in this case, and thus we find such payment within the scope of the term "transaction" used in Paragraph (K). *See also* AMERICAN HERITAGE DICTIONARY 1831 (4th ed. 2006) (noting that the term "transaction" may be defined as "[t]he act of transacting or the fact of being transacted").

[19] Furthermore, we find that not only was the initial payment of property taxes a "transaction," but it was also a transaction related to the Premises or the Improvements. Indeed, property tax assessments are based on the assessed value of the property. *See* Ind. Code § 6-1.1-2-3. The fact that Borrowers overpaid Marion County, and even that it was due to Marion County's calculation, does not change our conclusion that such tax payments were related to the premises. Accordingly, we conclude that the Tax Refunds arose by virtue of the Borrowers' previous property tax payments are transactions related to the premises, and are within Lender's security interest provided by Paragraph (K).

## *Conclusion*

[20] For the foregoing reasons, we reverse the trial court's judgment awarding receipt of the Tax Refunds to Borrowers and remand with instructions to enter judgment awarding receipt of the Tax Refunds to Lender.

[21] Reversed and remanded.

Crone, J., and Pyle, J., concur.