

**FILED**

Nov 14 2019, 9:05 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Siobhán M. Murphy
Benjamin C. Hoffman
Lewis Brisbois Bisgaard & Smith LLP
Indianapolis, Indiana

Brian P. Graffeo
Joel Plainfield
Kaplan, Williams, Graffeo & Stern LLC
Morristown, New Jersey

ATTORNEYS FOR APPELLEE

George A. Gasper
Derek R. Molter
Audrey K. Howard
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |
|---|---|
| SGS North America, Inc., <br><br> *Appellant-Defendant,* <br><br> v. <br><br> Christine Mullholand, as Stockholder Representative of Cybermetrix, Inc., <br><br> *Appellee-Plaintiff* | November 14, 2019 <br><br> Court of Appeals Case No. 19A-PL-1283 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Heather A. Welch, Judge <br><br> Trial Court Cause No. 49D01-1812-PL-48315 |

**Crone, Judge.**

# Case Summary

[1] This case arises from a dispute concerning whether purchasers owe sellers what is commonly referred to as an "earnout" under a stock purchase agreement. SGS North America, Inc. ("SGS"), appeals the trial court's order granting an application to confirm arbitration award filed by Christine Mullholand, as stockholder representative for the stockholders of Cybermetrix, Inc. (respectively "Mullholand" and "CMX"). In brief, Mullholand sold her company, CMX, to SGS and, in addition to the base purchase price, SGS agreed to pay CMX stockholders certain amounts (earnouts) contingent upon CMX's 2015 earnings before interest, taxes, depreciation, and amortization ("EBITDA") and CMX's 2015 and 2016 combined EBITDA. SGS paid the first contingent payment but not the second, claiming that CMX's 2015 and 2016 combined EBITDA did not meet the applicable threshold for the second contingent payment. Pursuant to the relevant provision of the parties' purchase agreement, the parties hired an auditor to perform an independent audit of CMX's 2015 and 2016 combined EBITDA and to resolve the earnout dispute. The auditor determined that CMX's 2015 and 2016 combined EBITDA met the threshold and entered a "final, conclusive, and binding" determination awarding the stockholders the second contingent payment of $3,000,000 plus a portion of the auditor's fees. SGS disagreed with the determination and refused to pay, so Mullholand filed the current claim to enforce the auditor's determination, characterizing such as a binding arbitration award. The Marion

County Commercial Court agreed with Mullholand and entered an order confirming the award and entering judgment in Mullholand's favor. We affirm.

## Facts and Procedural History

[2] CMX is an engineering and consulting business that provides management, test system design services, and engineering services. Mullholand founded and then operated CMX in Columbus for approximately twenty-five years until, on February 1, 2016, Mullholand and SGS entered into a stock purchase agreement ("the Purchase Agreement") for the sale and purchase of all the issued and outstanding shares of CMX's capital stock. SGS is a New Jersey corporation that is a subsidiary of an international corporation, SGS SA, that provides services similar to CMX. The Purchase Agreement provided a $21,000,000 base purchase price plus an additional contingent purchase price mechanism whereby stockholders would potentially receive additional payments from SGS ("First Contingent Payment" and "Second Contingent Payment") based on whether CMX's 2015 and 2016 EBITDA exceeded certain threshold amounts. Specifically, as the First Contingent Payment, the stockholders would receive an earnout of $4,000,000 if CMX's 2015 EBITDA was between $4,146,048 and $4,606,720, or an earnout of $5,000,000 if CMX's 2015 EBITDA was equal to or greater than $4,606,720. Appellant's App. Vol. 3 at 25. As the Second Contingent Payment, the stockholders would receive an earnout of $8,000,000 (minus the First Contingent Payment) if CMX's 2015 and 2016 combined EBITDA was between $8,915,067 and $9,905,630, or an

earnout of $10,000,000 (again minus the First Contingent Payment) if CMX's 2015 and 2016 combined EBITDA was equal to or greater than $9,905,630. *Id*.

[3] CMX's EBITDA for 2015 exceeded the applicable threshold of $4,606,720, and SGS paid the stockholders the First Contingent Payment of $5,000,000. However, according to SGS's calculations, CMX's 2015 and 2016 combined EBITDA did not meet the applicable threshold for the Second Contingent Payment. On February 28, 2017, SGS submitted a price report to Mullholand with SGS's calculations showing that CMX's 2015 and 2016 combined EBITDA fell just below the threshold amount set forth in the Purchase Agreement and stating that SGS believed that a Second Contingent Payment was not owed to the stockholders. Mullholand provided written notice to SGS of the stockholders' objection to SGS's submission.

[4] The parties were ultimately unsuccessful in resolving their disagreement as to SGS's calculations of CMX's 2015 and 2016 combined EBITDA and whether the Second Contingent Payment was owed. Section 2.7(b) of the Purchase Agreement provided a binding dispute resolution procedure for such disputes which stated in relevant part:

> In the event that the Stockholder Representative [i.e., Mulholland] objects to the [Contingent Purchase Price Report] submissions made by the Purchaser, the Purchaser and the Stockholder Representative shall use reasonable efforts to resolve any such objections. If no resolution is reached…, the Purchaser and the Stockholder Representative shall submit the issue to the Designated Auditor to review the submission. The Designated Auditor, shall, after reviewing all relevant matters as it deems

appropriate, deliver to the Stockholder Representative and the Purchaser a Designated Auditor Statement setting forth its calculations of EBITDA and the Contingent Purchase price (if any) payable, which shall be final and binding upon all of the parties to this Agreement.

*Id*. at 29.

[5] Accordingly, in July 2018, SGS and Mullholand retained Ernst and Young, LLP ("EY"),[1] to serve as the Designated Auditor and to calculate CMX's applicable EBITDA and to render a determination, delivered in the form of the "Designated Auditor Statement," that would be final and binding upon the parties, as contemplated by the Purchase Agreement. The agreement between the parties and EY was memorialized in an engagement agreement ("EY Engagement Agreement"). The EY Engagement Agreement provided that each party "shall cooperate fully with the Designated Auditor during the *arbitration*" and provided a schedule of deadlines for "the *arbitration*," and the parties agreed that "the Designated Auditor Statement will be conclusive and binding upon them with respect to the disputed items it addresses." *Id*. at 107-111 (emphases added).

---

[1] The Purchase Agreement provided that the "Designated Auditor" would be EY or "any other mutually acceptable independent certified public accountant." Appellant's App. Vol. 3 at 28. Emails between counsel for the parties indicate that Mullholand's counsel suggested PricewaterhouseCoopers as "one of the leading arbitrators for earn-out disputes like this," but SGS's counsel responded, "[W]e would prefer to stick with [EY] as the designated auditor." Appellee's App. Vol. 2 at 31. Thereafter, Mullholand's counsel "identified Christen Morand with [EY] to serve as the arbitrator in this case" to which SGS's counsel "d[id] not have any objection." *Id*. at 30.

The parties submitted voluminous materials to EY over the next several months. EY spent 415 hours evaluating the parties' submissions and issued an extensive and detailed Designated Auditor Statement on November 1, 2018. In short, EY determined that CMX's 2015 and 2016 combined EBITDA met the threshold requirement for a Second Contingent Payment and that the stockholders were entitled to $3,000,000 plus half the fees and expenses advanced to EY as the Designated Auditor ($107,000). The Designated Auditor Statement provided that, per the Purchase Agreement and the EY Engagement Agreement, this decision was "final, conclusive, and binding." *Id.* at 134.

On November 28, 2018, SGS requested that EY review the findings contained in the Designated Auditor Statement or, in the alternative, provide SGS with certain clarifications. EY declined SGS's request, reiterating to SGS that pursuant to the terms of the Purchase Agreement, the Designated Auditor Statement was "final, conclusive, and binding" on the parties. Appellant's App. Vol. 2 at 20. Section 2.3(c)(ii) of the Purchase Agreement provided that SGS was to pay the stockholders the amount awarded within twenty days of the release of the Designated Auditor Statement. SGS did not make payment to the stockholders.

On January 11, 2019, Mullholand filed an amended complaint for confirmation of arbitration award or, in the alternative, complaint for breach of contract in

the Marion County Commercial Court.[2] Specifically, Mullholand requested that the trial court confirm EY's $3,107,000 award in the stockholders' favor and enter judgment pursuant to Indiana's Uniform Arbitration Act, Indiana Code Chapter 34-57-2. In the alternative, Mullholand asserted that even if EY's decision did not constitute a binding arbitration decision, SGS's refusal to honor EY's decision was a breach of the Purchase Agreement. On February 7, 2019, Mullholand filed an application for confirmation of arbitration award, or in the alternative, a motion for summary judgment on the breach of contract claim. In response, SGS filed a motion to dismiss Mullholand's amended complaint pursuant to Indiana Trial Rule 12(B)(6) or, in the alternative, a motion to compel arbitration and stay the action. SGS argued that EY's determination did not constitute an arbitration award and thus Mullholand failed to state a claim upon which relief could be granted. In the alternative, SGS argued that the EY Engagement Agreement provided that any disputes regarding EY's calculations were themselves subject to arbitration and thus the court should stay the action and compel arbitration.

[9] The trial court held a hearing on all pending motions on April 10, 2019. Thereafter, the trial court entered its order granting Mullholand's application to confirm the arbitration award and denying SGS's motion to dismiss. The court concluded pursuant to Delaware law, which governs the interpretation of the Purchase Agreement, that the parties unambiguously agreed to arbitrate

---

[2] Mullholand filed her original complaint on December 5, 2018.

earnout disputes, that EY's determination constituted an arbitration award, and that SGS is bound by that determination. The trial court did not address Mullholand's alternative request for summary judgment on the breach of contract claim. The trial court entered judgment in favor of Mullholand for $3,107,200, plus interest. This appeal ensued.

## Discussion and Decision

SGS contends that the trial court erred in granting Mullholand's application to confirm arbitration award and, for the same reasons, in denying SGS's Indiana Trial Rule 12(B)(6) motion to dismiss for failure to state a claim. The dispositive issue in this appeal is whether the parties clearly and intentionally agreed to arbitrate earnout disputes in the Purchase Agreement, making EY's determination tantamount to an arbitration award that was properly confirmed, rather than dismissed, by the trial court upon Mullholand's application.

As we are presented with an issue of contract interpretation, our appellate standard of review is well settled. The interpretation of a contract is a pure question of law that is reviewed de novo. *Maynard v. Golden Living*, 56 N.E.3d 1232, 1238 (Ind. Ct. App. 2016). This Court owes no deference to the trial court's determination of questions of law. *2513-2515 S. Holt Rd. Holdings, LLC v. Holt Rd., LLC*, 40 N.E.3d 859, 865 (Ind. Ct. App. 2015). Similarly, we review de novo a trial court's grant or denial of a motion to dismiss for failure to state a claim pursuant to Indiana Trial Rule 12(B)(6), again giving no deference to the

trial court's decision. *EngineAir, Inc. v. Centra Credit Union*, 107 N.E.3d 1061,1065 (Ind. Ct. App. 2018).

[12] It is undisputed that while Indiana law governs any procedural questions involved,[3] pursuant to the Purchase Agreement's choice of law provision, Delaware substantive law governs our resolution of the dispositive issue on appeal. We begin by noting that "arbitration" is defined as "[a] dispute-resolution process in which the disputing parties choose one or more neutral third parties to make a final and binding decision resolving the dispute." BLACK'S LAW DICTIONARY (11th ed. 2019). Regarding agreements to arbitrate, the Supreme Court of Delaware has stated generally that

> [t]he public policy of Delaware favors arbitration. In a proceeding to stay or to compel arbitration, the question of whether the parties agreed to arbitrate, commonly referred to as "substantive arbitrability," is generally one for the courts and not for the arbitrators. In determining arbitrability, the courts are confined to ascertaining whether the dispute is one that, on its face, falls within the arbitration clause of the contract. Courts may not consider any aspect of the merits of the claim sought to be arbitrated, no matter how frivolous they appear. Any doubt as

---

[3] Indiana's Uniform Arbitration Act provides, among other things, a mechanism for enforcing agreements to arbitrate. *Marion Cmty. Sch. Corp. v. Marion Teachers Ass'n*, 873 N.E.2d 605, 608 (Ind. Ct. App. 2007). Indiana Code Section 34-57-2-12 provides in relevant part: "Upon application of a party … the court shall confirm an award…. Upon confirmation, the court shall enter a judgment consistent with the award and cause such entry to be docketed as if rendered in an action in the court." Section 34-57-2-15 provides in relevant part: "Upon the granting of an order confirming, modifying, or correcting an award, judgment or decree shall be entered in conformity therewith and be enforced as any other judgment or decree." Section 34-57-2-16 provides in relevant part that "an application to the court under this chapter shall be by motion and shall be heard in the manner and upon the notice provided by law or rule of court for the making and hearing of motions." Our supreme court has explained that "[c]onfirmation is a purely procedural mechanism by which a court converts an arbitration award into a judgment for enforcement purposes." *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 705 (Ind. 2012), *cert. denied* (2013).

> to arbitrability is to be resolved in favor of arbitration. A court will not compel a party to arbitrate, however, absent a clear expression of such an intent.

*SBC Interactive, Inc. v. Corp. Media Partners*, 714 A.2d 758, 761 (Del. 1998) (citations omitted).

[13]    Accordingly, the contract must reflect that the parties clearly and intentionally bargained for whether and how to arbitrate. *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010). Courts will not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate. *Id.*[4] "Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible to different interpretations.'" *Id.* (citations omitted). A trial judge must review a contract for ambiguity through the lens of "what a reasonable person in the position of the parties would have thought the contract meant." *Id.* (citations omitted). The contract is read as a whole, and each provision and

---

[4] SGS goes to great lengths to make sure that this Court, unlike the trial court, accords no weight to Delaware's public policy favoring the enforcement of arbitration agreements. To do so, SGS painstakingly explains to us the difference between answering the threshold question of whether there is an enforceable agreement to arbitrate in the first place and the question of whether the disputed matter is the type of claim that the parties agreed to arbitrate, as only the former is at issue here. *See* Appellant's Br. at 33 (citing *Graham v. State Farm Mut. Auto, Ins. Co.*, 565 A.2d 908, 910 (Del. 1989) (noting that the public policy is rooted in a desire to rebuke "the old judicial hostility to arbitration" and accept agreements to arbitrate)). Stated another way, the public policy favoring arbitration presupposes that the parties clearly and intentionally bargained for arbitration. *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002) (the policy favoring alternative dispute resolution mechanisms such as arbitration does not trump basic principles of contract interpretation, including the principle that a court will not compel a party to arbitrate absent a clear expression of such intent) (citation omitted). We assure SGS that we are well versed in the legal principles involved in the question we have been asked to address, as Indiana and Delaware law are in agreement on this issue. *See MPACT Constr. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 907 (Ind. 2004) ("Only after it has been determined that the parties agreed to arbitrate their disputes does the policy favoring arbitration play an important role.").

term is given effect, so as not to render any part of the contract mere surplusage. *Id*. at 397. The absence of the "express" or "magic" word "arbitration'" does not render a contract ambiguous, nor is such term required to support a finding that the parties clearly and intentionally agreed to arbitrate. *See id.*

[14] Upon review of the contract at issue here, specifically the language of Section 2.7(b) of the Purchase Agreement, we have little difficulty concluding that the parties clearly and intentionally agreed to arbitrate earnout disputes, and to do so through the Designated Auditor process. Although the term "arbitration" does not appear, the agreement here delegates to the Designated Auditor broad authority to consider evidence, make determinations, and conclusively resolve any earnout dispute arising under Section 2.7(b). This provision is not reasonably or fairly susceptible to different interpretations, and reasonable persons in the position of the parties would have thought that they were selecting a form of dispute resolution that placed final and binding resolution of earnout disputes within the sole authority of the Designated Auditor. The provision clearly and unambiguously reflects the parties' intention to arbitrate.

[15] SGS suggests that rather than evincing a clear intention to arbitrate, Section 2.7(b) merely calls for an "expert determination" of earnout disputes. We acknowledge that Delaware law maintains a distinction between an arbitration and an expert determination. *See Penton Bus. Media Holdings, LLC v. Informa PLC*, 2018 WL 3343495, at *7-11 (Del. Ch. July 9, 2018) (providing comprehensive overview of Delaware law discussing differences between arbitration and expert appraisal). However, in doing so, Delaware courts look

to the type and scope of authority given the neutral third party to resolve the dispute in question. *Id.* Specific limiting language providing that an independent auditor is acting "as an expert and not as an arbitrator" clearly narrows the scope of the auditor's role and evinces the parties' intentions that the auditor's decision constitute an expert determination and not an arbitration. *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.,* 166 A.3d 912, 930 (Del. 2017).

[16] There is no such stipulation or limiting language in the parties' agreement here, leaving only language that clearly gives the Designated Auditor full and complete authority to act as an arbiter and issue a final and binding decision as to an earnout dispute. Indeed, the Designated Auditor is granted the authority not only to make EBITDA calculations (issues of fact), but also to determine SGS's legal liability to pay the Second Contingent Payment (issue of law). This is exactly the type and scope of authority delegated to an arbitrator and not an expert. *See Penton*, 2018 WL 334395, at *15 ("If the proceeding is an arbitration, this means the parties have intended to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter.") (citation omitted). If the parties here intended to limit the scope of the Designated Auditor's authority, evincing an intent that the agreement be one for an expert determination rather than an arbitration, they could have easily done so. In fact, this practice has become the norm for parties seeking only an expert determination on a narrow issue involved in a larger dispute. *See generally id.* at *13 (noting the standard use of limiting language, and that use of the

expression "'as an expert and not as arbitrator' is now so common that it is difficult to conceive of a case in which a court would not treat those words as meaning exactly what they say.'") (citations omitted). The specific language used by the parties here, coupled with the lack of limiting language, indicates a clear intent to arbitrate.[5]

[17] Regardless, it is evident that Delaware courts, much like Indiana courts, are less concerned with the exact nomenclature used by the parties than they are with whether reasonable persons in the position of the parties would have thought they were clearly and intentionally agreeing to arbitrate. Thus, when a party, such as SGS, makes ambiguity arguments like those presented here, Indiana appellate courts have referred to Hoosier poet James Whitcomb Riley's "Duck Test" or to the famous Shakespeare quote, "What's in a name? that which we call a rose/By any other name would smell as sweet." *See, e.g.*, *Walczak v. Labor Works-Ft. Wayne LLC*, 983 N.E.2d 1146, 1148 (Ind. 2013); *Becker v. State*, 992 N.E.2d 697, 698 (Ind. 2013).[6] The process agreed to by the parties in Section 2.7(b) of the Purchase Agreement clearly sets out a binding dispute resolution procedure so similar to arbitration that reasonable persons would understand it

---

[5] Both parties cite to countless unreported cases applying Delaware law as persuasive authority in support of their respective positions. We see no need to discuss or reproduce them all here. Rather, we have applied Delaware law's well-settled general principles of contract interpretation, and specifically arbitration agreements, to the specific and unique facts of this case.

[6] As Whitcomb Riley expressed it, "[w]hen I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck." *Walczak*, 983 N.E.2d at 1148 (footnote omitted). Similarly, Gertrude Stein aptly answered Shakespeare's question, "Rose is a rose is a rose is a rose." *Becker*, 992 N.E.2d at 698 n.2.

as a clear agreement to arbitrate. In other words, an arbitration agreement is an arbitration agreement is an arbitration agreement.

[18] We conclude that Section 2.7(b) of the Purchase Agreement clearly and unambiguously reflects the parties' intention to arbitrate earnout disputes. Accordingly, we agree with Mullholand that EY's determination of the parties' earnout dispute constitutes a binding arbitration award.[7] The trial court did not err in granting Mullholand's application for confirmation of arbitration award and in denying SGS's motion to dismiss her application for the same reasons.[8] Therefore, we affirm the trial court's entry of judgment in favor of Mullholand and against SGS for $3,107,200 plus appropriate interest.

[19] Affirmed.

Baker, J., and Kirsch, J., concur.

---

[7] EY issued its Designated Auditor Statement on November 1, 2018. SGS had ninety days, or until January 30, 2019, to file an application to vacate or modify that award with the trial court. *See* Ind. Code § 34-57-2-13 (application to vacate award); Ind Code § 34-57-2-14 (application for modification or correction of award). SGS did not do so. Accordingly, despite SGS's continued disagreement with EY's findings and award to Mullholand, we agree with the trial court's statement that it is now without statutory authority to vacate or modify EY's award.

[8] Because we determine that the parties clearly and unambiguously agreed in the Purchase Agreement to arbitrate earnout disputes, we need not reach Mullholand's alternative argument in her appellee's brief that a second contract between the parties, the EY Engagement Agreement, also represents a clear and unambiguous agreement to arbitrate earnout disputes. We disagree, however, with SGS's suggestion that it would be inappropriate for us to consider this alternative ground for affirming the trial court simply because it was neither raised by SGS nor specifically addressed by the trial court in its order confirming the arbitration award. It is well settled that an appellee may defend, and we may affirm, the trial court's ruling on any grounds, whether or not the trial court considered those grounds. *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012); *J.M. v. Review Bd. of Ind. Dept. of Workforce Dev.*, 975 N.E.2d 1283, 1289 (Ind. 2012).