

IN THE

# Court of Appeals of Indiana

Edward Harrill,

*Appellant / Cross-Appellee-Respondent,*

v.

Karen Harrill,

*Appellee / Cross-Appellant-Petitioner.*



FILED

Apr 08 2025, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

April 8, 2025

Court of Appeals Case No.
24A-DC-1793

Appeal from the
Dearborn Circuit Court

The Honorable
Jeffrey Sharp, Special Judge

Trial Court Cause No.
15C01-2201-DC-2

**Opinion by Senior Judge Robb**
Judges Brown and Foley concur.

**Robb, Senior Judge.**

# Statement of the Case

Edward Harrill and Karen Harrill separately appeal the trial court's judgment dissolving their marriage. Edward argues the trial court erred in deciding which assets and liabilities are included in the marital estate. Karen argues the trial court should have determined the parties' premarital agreement was invalid. Concluding the trial court did not err, we affirm.

# Issues

Edward raises two issues:

 I. Whether the trial court erred by including two investment accounts in the marital estate.

 II. Whether the trial court erred by excluding from the marital estate a debt associated with an investment account owned by Edward.

Karen raises one issue:

 III. Whether the trial court erred in holding that the premarital agreement was valid.

## Facts and Procedural History

[4] In 2003, Karen and Edward were in a relationship and decided to get married. Karen, age thirty-five, had a minor child from a prior relationship. She worked full-time as a flight attendant but also had several part-time jobs, including working as a real estate agent. Karen owned a house, had a 401k retirement account, and had taken out a life insurance policy for her child's benefit. Edward was a pilot, and his family was well-off.

[5] Edward's father encouraged Edward to ask Karen to sign a premarital agreement to protect investments that Edward had received from his parents. Edward and Karen discussed terms, and he hired a law firm to prepare a document. He presented a draft to Karen. Edward told her she did not need an attorney, but she could contact one. Karen did not contact an attorney or discuss the agreement with anyone else.

[6] After having several days to review the draft, Karen told Edward that she wanted assurances that he would pay for her child's college education. He talked with his attorney, who revised the draft to add a provision stating that in the event of a divorce, Edward would pay for the educational expenses of Karen's child, as well as for any children born during the marriage. On July 16, 2003, the parties signed the revised "Pre-Nuptial Agreement" ("the Agreement"). Tr. Ex. Vol. I, p. 5. They were married on July 26, 2003.

[7] Karen later conceded that Edward had not committed any fraud or misrepresented anything about the Agreement. She understood that Edward's

family had money, and the Agreement was intended to limit her access to investments Edward had received from his parents, but she "never wanted his money" and "didn't care about [it.]" Tr. Vol. 1, p. 47.

[8] As for the parties' property, the Agreement provides: "All property owned separately by a party prior to the marriage shall continue to be owned as separate property of such party after the marriage." Tr. Ex. Vol. I, p. 6. The Agreement further states: "All property individually acquired by either party after the date of their marriage through gifts or inheritance shall be the separate property of the party acquiring the property." *Id.* During the marriage, "[e]ach party shall have the exclusive use, management, control and benefit of his or her separate property[.]" *Id.* And Edward and Karen were free to "give, devise, bequeath, transfer, or assign any property to the other, whether by lifetime gift, valid Will, or otherwise[.]" *Id.* Next, the Agreement provides:

> In the event of divorce, legal separation, or other dissolution of the marriage, each party waives any rights he or she may have with respect to the separate property of the other party, whether owned prior to the marriage or acquired after the parties' marriage as separate property and any rights to maintenance.

*Id.* at 7. And if a court dissolved the parties' marriage, "all property, whether real or personal, individually held by a party shall be the sole property of that party." *Id.*

[9] As for the separate property Karen and Edward had before the marriage, the Agreement states:

Each party has fully disclosed to the other his or her financial condition, including the amount of assets, income and liabilities each has, and each is satisfied and knows and understands the financial condition of the other and hereby waives any further disclosures, but neither party is entering into the marriage or into this Agreement in reliance upon any recitals with respect to the other party's financial condition. Each party agrees that Exhibits "A" and "B" attached hereto set forth a description of the character and fair market value of substantially all of their respective assets (excluding household goods and miscellaneous items of personal effects), liabilities and income.

*Id.* at 5.

[10] An attachment ("the Attachment") to the Agreement purported to list their separate assets and liabilities. *Id.* at 10. Among other assets, Edward listed an account with Fidelity ("the Fidelity account") that was worth $822,189.88. But Karen's 401k account and bank accounts were omitted. In addition, in the 1970s Edward's parents had purchased two investment accounts, one with a predecessor to NextEra Energy and the other with Alliant Energy (collectively, "the Energy accounts"), intending to give them to him. The Energy accounts were not listed on the Attachment. Edward later claimed he was unaware of the Energy accounts' existence until after the marriage, but they were listed as his assets on his income tax returns for 2001 and 2002.

[11] Karen and Edward had two children together during the marriage. She quit her part-time jobs and cut back on her flight attendant work to focus on raising the children. Later, she obtained a bachelor's degree in nursing. Edward's parents

paid for her tuition. In addition, when Karen's child from a previous relationship began college, Edward's parents paid the tuition bills.

[12] As to finances during the marriage, Edward did not grant Karen access to his Fidelity account, but she had access to other accounts they held jointly. She adopted and followed a rigorous budgeting system to manage their household expenses. The Fidelity account was not part of the budgeting system, and Edward used funds from the account to pay for expenses outside of their budget. In addition, Edward took out a margin loan against the Fidelity account, using the principal as collateral. He used the borrowed funds to pay for items that benefited the family, such as home improvements and vehicles, but also to cover his own expenses, such as solo vacations. By 2022, the account was worth over $3 million, but the margin loan was valued at $1,576,901.

[13] In January 2022, Karen petitioned to dissolve the parties' marriage, raising claims related to child custody and support, as well as the division of the marital estate. Karen also alleged the Agreement was invalid because it was unconscionable. Edward argued Karen was jointly responsible for the debt on the Fidelity account.

[14] After Karen filed to dissolve the marriage, Edward transferred the Energy accounts' funds, which were collectively worth over $1 million, into the Fidelity account and paid down the margin loan. He reduced the debt to approximately $720,000.

On December 5, 2023, the parties presented evidence on the validity of the Agreement and other issues. In a nonfinal order, the court determined: (1) the Agreement was not unconscionable; and (2) the Fidelity account, and the associated debt, belonged to Edward.

In May 2024, the trial court held evidentiary hearings over two days on the remaining issues. The court later issued findings of fact and conclusions thereon. The court determined the Energy accounts should be included in the marital estate. The court also included Karen's retirement accounts in the marital estate. Further, the court reiterated that the Fidelity account, and the debt associated with the account, should be excluded from the estate and attributed to Edward alone. Finally, the court decided an equal division of the estate was appropriate and ordered Edward to give Karen an equalization payment of $1,153,560.16, payable in installments.[1] This appeal followed.

## Discussion and Decision

### Standard of Review

Edward requested findings of fact and conclusions thereon. In these circumstances, we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). "'A judgment is

---

[1] The trial court also addressed child custody, parenting time, and child support, but neither of the parties has appealed that portion of the court's judgment.

clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment.'" *Pilkington v. Pilkington*, 227 N.E.3d 885, 892 (Ind. Ct. App. 2024) (quoting *In re Paternity of K.I.*, 903 N.E.2d 453, 457 (Ind. 2009)).

[18] We consider only the evidence favorable to the judgment and the reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. *Drake v. Drake*, 221 N.E.3d 734, 739 (Ind. Ct. App. 2023). "'Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court.'" *In re Marriage of Nickels*, 834 N.E.2d 1091, 1095 (Ind. Ct. App. 2005) (quoting *Elkins v. Elkins*, 763 N.E.2d 482, 485 (Ind. Ct. App. 2002), *trans. denied*). "[B]ut we review legal conclusions de novo." *Thompson v. Wolfram*, 162 N.E.3d 498, 503 (Ind. Ct. App. 2020).

## Edward's Claims

[19] Before a trial court can divide marital property, including both assets and liabilities, the court must first "identify the property to include in the marital estate." *Roetter v. Roetter*, 182 N.E.3d 221, 227 (Ind. 2022). Edward argues the trial court erred in determining: (1) the Energy accounts were part of the marital estate; and (2) the debt associated with the Fidelity account was Edward's sole responsibility. Addressing these arguments requires us to apply the Agreement to the disputed assets and liabilities.

"Premarital agreements are legal contracts entered into prior to marriage to settle the interest each spouse has in the property of the other and therefore, standard principles of contract formation and interpretation apply to such agreements." *Thompson*, 162 N.E.3d at 503. These agreements are favored by law and will be liberally construed to realize the parties' intentions. *Id.* at 504.

We consider the parties' intent "as expressed in the language of the contract." *Schmidt v. Schmidt*, 812 N.E.2d 1074, 1080 (Ind. Ct. App. 2004). "If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning." *2513-2515 S. Holt Rd. Holdings, LLC v. Holt Rd., LLC*, 40 N.E.3d 859, 865 (Ind. Ct. App. 2015), *trans. denied*. We also "read all of the contractual provisions as a whole to accept an interpretation that harmonizes the contract's words and phrases and gives effect to the parties' intentions as established at the time they entered [sic] the contract." *Schmidt*, 812 N.E.2d at 1080. The interpretation of a contract is generally a question of law, becoming a question of fact only if the "contract's terms are ambiguous, inconsistent, or uncertain[.]" *Wohlt v. Wohlt*, 245 N.E.3d 611, 616 (Ind. 2024). Neither party alleges that the Agreement is ambiguous.

As for the Energy accounts, the trial court determined they were part of the marital estate because they were not listed in the Attachment to the Agreement as Edward's separate property. Edward notes that under Indiana law, as a general matter he and Karen were not required to disclose their separate property to each other. *See Selke v. Selke*, 600 N.E.2d 100, 102 (Ind. 1992) ("[T]here is no absolute and mandatory duty imposed upon the parties to

disclose information regarding possessions [in a premarital agreement.]").  But in *Selke*, the Indiana Supreme Court also stated, "a duty to disclose asset value information may arise from unique factual circumstances[.]"  *Id.* at 101.

[23]    Here, Karen and Edward stated in the Agreement that they had "fully disclosed to the other his or her financial condition, including the amount of assets, income and liabilities each has[.]"  Tr. Ex. Vol. I, p. 5.  They also agreed the Attachment set forth "a description of the character and fair market value of substantially all of their respective assets[.]"  *Id.*  Under the plain language of the Agreement, the parties each assumed a duty of disclosure.  And despite Edward's testimony that he was unaware of the Energy accounts before the marriage, they were listed as assets in his 2001 and 2002 tax returns.  We also note that, for reasons that are unclear in the record, Karen's 401k account was also not included in the Attachment, and the trial court included her retirement accounts in the marital estate.

[24]    Edward cites *Perrill v. Perrill*, 126 N.E.3d 834 (Ind. Ct. App. 2019), *trans. denied*, to support his claim that failure to list the accounts in the Attachment does not mean they are marital property, but *Perrill* is distinguishable.  In that case, the key question was whether the premarital agreement was valid despite the parties' failure to include a list of one spouse's excluded property in the document.  The Court, citing both:  (1) the longstanding rule that identification of assets is not required in a premarital agreement; and (2) a clause in the agreement providing that the inadvertent omission of property shall not affect

the agreement's validity; concluded the spouse's list was not essential to the agreement. *Id.* at 842-43. As a result, the agreement was enforceable.

[25] In the current case, the parties dispute whether assets are part of the marital estate, not whether the omission of the Energy accounts renders the Agreement invalid. In addition, the Agreement states the parties have disclosed their financial conditions, and the assets listed in the Attachment represent substantially all of their assets. Thus, unlike in *Perrill*, Edward assumed a duty of disclosure. The trial court did not err in concluding the Energy accounts were part of the marital estate because Edward failed to list them as his separate property in the Agreement.[2]

[26] Turning to the margin loan debt associated with the Fidelity account, there is no dispute that the account was listed as Edward's separate property in the Attachment to the Agreement. Karen had no access to that account. Under the Agreement, Edward had exclusive control over the account, including the right to "mortgage [or] pledge" it. Tr. Ex. Vol. I, p. 6. Obtaining the margin loan using the Fidelity account's funds as collateral was a valid exercise of Edward's rights under the Agreement. And the plain language of the Agreement provides that each party may voluntarily give their separate property to the other party.

---

[2] In the alternative, Edward claims the Energy accounts could be considered gifts he received during the marriage at the time he became aware of them. In those circumstances, he claims the accounts would still be his separate property under the Agreement. During trial, Edward did not present any evidence that the accounts were gifted to him alone. His parents paid for college tuition for Karen and her child from a prior relationship, and they could have intended for the accounts to go to both Edward and Karen at the time they disclosed the accounts' existence. Edward has failed to meet his burden of proof on this claim.

Edward's use of some of the margin loan funds for his family's benefit falls under his gifting power under the Agreement and demonstrates his control over, and responsibility for, the loan.

Edward argues he took out the margin loan "in order to finance martial [sic] assets like real estate, personal property, and expenses." Appellant's Br. p. 22. But this argument merely reinforces the trial court's conclusion. Only Edward could have taken out the margin loan on his Fidelity account. Fidelity's margin loan informational documents describe the loan as "[a] line of credit secured by securities *you* already own[.]" Tr. Ex. Vol. II, p. 231 (emphasis added). Edward's choice to use some of the loan funds for the family's benefit does not transform the margin loan debt from his personal liability into a marital liability. For these reasons, the trial court did not err in concluding the loan debt was his responsibility alone. *Cf. Crider v. Crider*, 26 N.E.3d 1045, 1049-50 (Ind. Ct. App. 2015) (trial court erred in excluding federal tax debt from marital estate; debt arose from parties' joint tax return, and IRS notice stated both parties were responsible for tax obligation).

## Karen's Cross-Appeal Claim

Karen argues the trial court should have determined the Agreement was invalid when executed because her signature was involuntary and the Agreement was unconscionable. The General Assembly has stated: "A premarital agreement is not enforceable if a party against whom enforcement is sought proves that . . . the party did not execute the agreement voluntarily; or . . . the agreement was unconscionable when the agreement was executed." Ind. Code § 31-11-3-8(a)

(1997). Whether a premarital agreement is unconscionable is a question of law. Ind. Code § 31-11-3-8(c). "Underlying that legal determination may be factual determinations regarding the circumstances surrounding execution of the agreement, which we review for clear error as we would any other factual determination." *Fetters v. Fetters*, 26 N.E.3d 1016, 1021 (Ind. Ct. App. 2015), *trans. denied*.

[29]   Title 31 of the Indiana Code does not define "voluntarily," and the parties do not direct us to a definition elsewhere in the Code. Black's Law Dictionary defines the word as "Intentionally; without coercion." *Voluntarily*, BLACK'S LAW DICTIONARY p. 1605 (8th Ed. 1990). Here, Edward gave Karen a draft Agreement well before the wedding ceremony, and she had several days to review it. He told her that although he did not think she needed her own attorney, she could hire one if she wanted. Karen sought no one's advice about the Agreement.

[30]   Karen testified that she did not understand the Agreement, but the trial court was not required to accept her testimony. When Karen signed the Agreement, she was thirty-five years old and had worked as a flight attendant and a real estate agent. She had bought a house, opened a 401k account, and purchased life insurance. Karen was experienced in financial matters.

[31]   Next, Karen points to her testimony in which she said Edward wanted her to sign the Agreement to appease his parents. Again, the trial court was not required to credit her testimony. In any event, Karen testified she was "not

really sure" if she was coerced into signing the Agreement. Tr. Vol. 1, pp. 48-49. And she stated that she understood that the Agreement was intended to protect investments that Edward had received from his family, and she "never wanted his money" and "didn't care about [it.]" *Id.* at 47. The trial court did not err in determining Karen signed the Agreement without coercion. *See Ryan v. Ryan*, 659 N.E.2d 1088, 1092 (Ind. Ct. App. 1995) (affirming trial court determination that premarital agreement was valid; the spouse challenging the agreement "was [not] compelled or coerced to sign[.]"), *trans. denied*.

[32] Turning to the question of unconscionability, the Indiana Supreme Court has stated:

> [A] contract is unconscionable if there was a gross disparity in bargaining power which led the party with the lesser bargaining power to sign a contract unwillingly or unaware of its terms and the contract is one that no sensible person, not under delusion, duress or distress would accept. The doctrine of unconscionability necessarily looks to the time of execution.

*Rider v. Rider*, 669 N.E.2d 160, 162 (Ind. 1996) (quoting *Justus v. Justus*, 581 N.E.2d 1265, 1272 (Ind. Ct. App. 1991), *trans. denied*). Relevant considerations include: (1) whether both parties had the assistance of independent legal counsel; (2) the economic circumstances of the parties resulting from the agreement; and (3) the conditions under which the agreement was made, including the knowledge of the other party. *See Fetters*, 26 N.E.3d at 1021 (discussing factors).

[33]     Karen did not have her own attorney, but Edward informed her she could hire one if she wanted.  After reviewing the draft Agreement, she asked him to add a provision ensuring that he would pay for her child's education even in the event of divorce, and he agreed.  Karen signed the Agreement over a week before the ceremony, not mere days before.

[34]     Karen points to the disparity in the parties' assets at the time they executed the Agreement.  Edward had more resources than Karen, but she conceded he had not engaged in fraud or misrepresentation at any point in the process of negotiating or signing the Agreement.  And Karen had owned a home, had a 401k, and had bought a life insurance policy for the benefit of her child.  Although she had less resources than Edward, she was not so poverty-stricken as to demonstrate a gross disparity in bargaining power.  Under these circumstances, we cannot conclude "that no sensible person, not under delusion, duress, or distress, would [have accepted]" the Agreement.  *Rider*, 669 N.E.2d at 162.  The trial court did not err in determining that the Agreement was not unconscionable.[3]  *Cf. Fetters*, 26 N.E.3d at 1021-22 (premarital agreement unconscionable; wife was only sixteen at time of execution, had poor reading skills, brought no assets to marriage, and was under the influence

---

[3] Karen also argues that if she shares responsibility for the debt related to the Fidelity account, then the Agreement is unconscionable because she did not have any control over the account at the time of the marriage or during the marriage.  This argument fails because we are affirming the trial court's determination that Edward is solely responsible for that account and its debt.

of her husband, who was older and had initiated a sexual relationship with her when she was underage).

## Conclusion

[35] For the reasons stated above, we affirm the judgment of the trial court.

[36] Affirmed.

Brown, J., and Foley, J., concur.

ATTORNEY FOR APPELLANT

R. Patrick Mcgrath
Alcorn Sage Schwartz & Magrath
Madison, Indiana

ATTORNEYS FOR APPELLEE

Aaron Freeman
Indianapolis, Indiana

Richard A. Butler
Lawrenceburg, Indiana